FILED

THE UNITED STATES DISTRICT COURT 2003 JAN 15 PM 3: 09
FOR THE MIDDLE DISTRICT OF FLORIDA
**Orlando Division**

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

|  |  |  |
|---|---|---|
| JOSEPH J. JACOBONI | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 6:02-cv-510-Orl-22DAB |
| KPMG LLP, | ) ) ) | |
| and | ) ) | |
| QA INVESTMENTS LLC | ) ) | |
| Defendants. | ) ) ) | |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, Joseph J. Jacoboni, through undersigned counsel, and files this Second Amended Complaint against Defendants KPMG LLP ("KPMG") and QA Investments LLC ("QA") for indemnification and money damages arising from KPMG's and QA's development, promotion and implementation of a tax strategy in connection with Mr. Jacoboni's federal income tax return for 1997. Mr. Jacoboni's tax return was prepared by KPMG and is under audit by the United States Internal Revenue Service ("IRS"). Before December 3, 2002, Mr. Jacoboni committed to settle his tax liability in accordance with an IRS formal settlement offer to participants in tax shelters known by the acronyms FLIP or OPIS that were promoted by KPMG and QA to hundreds of high net worth taxpayers, including Mr. Jacoboni.

Mr. Jacoboni alleges a federal claim under the Racketeer Influenced and Corrupt Organizations Act and Florida state law claims of breach of contract, accountant malpractice, fraud, negligent misrepresentation, promissory estoppel and the Florida Deceptive and Unfair Trade Practices Act.

## THE PARTIES

1.  Plaintiff Joseph J. Jacoboni is a United States citizen who resides in Lake Mary, Seminole County, Florida 37746.

2.  Defendant KPMG is an international accounting and consulting firm known as one of the "Big Five" accounting firms in the United States. KPMG is organized in Delaware and maintains its headquarters in New York. At all relevant times, Mr. Jacoboni dealt with KPMG executives based in KPMG's "Personal Financial Planning" office in Charlotte, North Carolina.

3.  Defendant QA is a Delaware limited liability company with its principal place of business in Seattle, Washington. Mr. Jacoboni entered into a QA Investments, LLC Investment Advisory Agreement with QA dated September 10, 1997. Quellos Group LLC ("Quellos") is a Delaware limited liability company with its principal place of business in Seattle, Washington. Quellos is the parent of QA and controls QA as a legal and practical matter after QA terminated its investment advisory business effective April 8, 2000. Quellos also controls Quadra Capital Management, LP, an affiliate of both QA and Quellos that was involved in the KPMG/QA Tax Strategy described in paragraph 9 below.

## JURISDICTION AND VENUE

4.  Jurisdiction of this Court is based on the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* Mr. Jacoboni's state law claims all relate to the

marketing and implementation of the KPMG/QA Tax Strategy described in paragraph 9 below. This Court should exercise its discretion and take supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this District under 28 U.S.C. § 1391(a) and (c) because the Plaintiff resides in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District. Venue is proper in this Division because Mr. Jacoboni resides in Seminole County within the Orlando Division. Moreover, KPMG and QA are both subject to personal jurisdiction in this District and Division.

## STATEMENT OF FACTS

6.      Mr. Jacoboni has been very successful as an entrepreneur, but he is unsophisticated in tax matters. Mr. Jacoboni was a founder and executive of Software Support, Inc., which was in the business of fee-based technical support for computer systems. In 1997, Mr. Jacoboni sold his shares in his company to Matrixx Marketing, Inc., a subsidiary of Cincinnati Bell, which acquired all of the outstanding shares in his company. Mr. Jacoboni faced a possible capital gain of over $28 million on his stock sale on his 1997 federal income tax return.

7.      In 1997, Mr. Jacoboni maintained his personal banking relationship with First Union National Bank of Florida ("First Union"). The proceeds of Mr. Jacoboni's stock sale were deposited in his account with First Union. First Union's account representative was aware of the large deposit into Mr. Jacoboni's account and of the potential large capital gain that Mr. Jacoboni might have to recognize on his federal income tax return.

8.      The First Union account representative referred Mr. Jacoboni to KPMG for tax planning and related professional services. KPMG first contacted Mr. Jacoboni in September

1997. Mr. Jacoboni dealt most extensively with Ms. Carolyn Branan, a Partner in KPMG's "Personal Financial Planning Group" in Charlotte, North Carolina, and her colleagues Dale Baumann and Craig Richie. In the course of his early contacts with Ms. Branan, she proposed an investment strategy summarized below. She also represented that he would need to engage the investment services of QA, which would certify the "economic substance" of KPMG's tax strategy for Mr. Jacoboni and direct the operational aspects of the investments. Mr. Jacoboni has recently learned that First Union referred many high net-worth individuals to KPMG, and that QA also was involved as investment and tax advisor to many such individuals.

9.      KPMG and QA sold their investment strategy to Mr. Jacoboni as a "no lose" proposition. He was assured that he would either make money or incur large capital losses on the investments to offset against his capital gains. KPMG advised Mr. Jacoboni that the strategy strictly complied with IRS rules and regulations. When Mr. Jacoboni expressed his intention to retain a lawyer or a tax or financial advisor to help him understand the complex investment, KPMG executives told him he could not involve any other professionals because the investment "strategy" was "confidential" (this investment strategy is hereinafter referred to as the "KPMG/QA Tax Strategy"). KPMG repeatedly assured Mr. Jacoboni that the "strategy" was a "clean deal, never audited." KPMG refused to explain the KPMG/QA Tax Strategy to Mr. Jacoboni's accountant, Mr. Philip Blake, and told Mr. Blake "don't worry about it." The KPMG/QA Tax Strategy involved the following transactions carried out from September to the end of 1997 by QA and KPMG on behalf of Mr. Jacoboni:

(a)      KPMG and QA arranged for Mr. Jacoboni to purchase 1,497 shares in a large foreign bank, Union Bank of Switzerland ("UBS"), on September 26, 1997. The purchase was at $1,168.45 per share for a total price of approximately $1,749,178.

4

(b)     On September 30, 1997, Mr. Jacoboni purchased a Warrant from a Cayman Island company, Jacaranda Capital, Inc. ("Jacaranda"), which was 100% owned by an unrelated foreign person. The warrant entitled Mr. Jacoboni to purchase more than 50% of the shares of Jacaranda and had a one-year expiration date. The cost of the warrant was $2,450,000.

(c)     At the time of commencing the KPMG/QA Tax Strategy, Jacaranda had commitments in place from UBS to finance 100% of Jacaranda's purchase of UBS shares. The financing was at market interest rates. Jacaranda purchased 29,610 shares of UBS on September 30, 1997, at a price of CHF (Swiss francs) 1,720 per share for a total price of over $35 million.

(d)     On September 30, 1997, Jacaranda sold 29,610 "call options" to UBS at a strike price of CHF 1,634 per share for the bank to purchase its shares. Jacaranda also purchased from UBS 29,610 "put options" with a strike price of CHF 1,548 per share for Jacaranda's purchase of 29,610 shares of UBS. QA advised Jacaranda to enter into these transactions for hedging purposes supposedly in order to protect Jacaranda's leveraged investment position from a significant drop in price of its UBS shares.

(e)     On November 19, 1997, UBS shares were trading at CHF 1,676. UBS exercised its call option and purchased 29,610 shares of its stock from Jacaranda at the strike price of CHF 1,634 per share. There was no written agreement between Jacaranda and UBS that required UBS to redeem its shares.

(f)     Also on November 19, 1997, Mr. Jacoboni purchased directly from UBS 29,610 over-the-counter call options on UBS shares in order to maintain his overall

portfolio position in UBS shares. On November 27, 1997, Mr. Jacoboni sold his call options back to UBS at a profit of approximately $193,189.

(g) On December 28, 1997, Mr. Jacoboni elected to put his warrant back to Jacaranda for its zero value.

(h) Mr. Jacoboni sold 1,134 shares of UBS for $1,649,766 on December 30, 1997, yielding a profit of approximately $324,738. Mr. Jacoboni retained 363 shares of UBS in his portfolio.

These transactions were designed to effect a "basis shift" from the redeemed UBS shares held by Jacaranda to the UBS shares held by Mr. Jacoboni, which "basis shift" enabled Mr. Jacoboni to recognize a capital loss on the subsequent sale of his UBS shares. These financial transactions to achieve the KPMG/QA Tax Strategy for Mr. Jacoboni were accomplished at the direction of and were executed by KPMG, QA and their agents. KPMG also promised that a "more likely than not" tax opinion would be provided by KPMG for the purpose of protecting Mr. Jacoboni in any audit by the IRS. The KPMG/QA Tax Strategy is further described and documented below.

10. At no time did KPMG or QA apprise Mr. Jacoboni or his accountant, Philip Blake, of significant tax risks associated with the KPMG/QA Tax Strategy. In fact, KPMG represented that the KPMG/QA Tax Strategy was "bullet proof" because it "uses IRS's own laws against them." But undisclosed tax risks included the possibility that IRS would not only deny the capital loss, resulting in an increased tax liability and accompanying interest, but impose accuracy-related penalties or, even worse, the possibility that IRS would target the basis-shifting transaction as an "abusive tax shelter." Neither KPMG nor QA told Mr. Jacoboni that the KPMG/QA Tax Strategy should have been registered as a "tax shelter" with the IRS and that KPMG and QA should have been listed as "promoters" as required by IRS rules. During the

period at issue, if not before, tax strategists were well aware that the Department of Treasury and the IRS knew of various loss schemes involving artificial basis and were formulating both legislative and administrative responses to the growing number of tax shelters being marketed. *See e.g.,* Lee A. Sheppard, "Importation of Built-in Losses and Devolution", Vol. 79, <u>Tax Notes</u>, No. 2 (April 13, 1998).

11.    KPMG and QA regarded various tax strategies, including the Foreign Leveraged Investment Program ("FLIP") tax strategy, as their joint venture. KPMG was the tax strategist and QA was the investment and operational tactician. The two institutions worked closely and seamlessly in carrying out the KPMG/QA Tax Strategy, as well as similar FLIP transactions. QA employees had expertise in overseas capital markets and had many contacts with bank executives and investment bankers in Europe and in the Cayman Islands. Norman Bontje was the Chief Financial Officer of QA and was instrumental in establishing the economics in the KPMG/QA Tax Strategy. David Smith left KPMG and joined QA in 1997 as a vice president to help implement the KPMG/QA Tax Strategy. Ralph Lovejoy left First Union and joined QA in 1998 before KPMG prepared Mr. Jacoboni's tax return for 1997. On information and belief, Mr. Lovejoy of QA is married to Carolyn Branan of KPMG, who most extensively dealt with Mr. Jacoboni. Mr. Daniel McNamara, controller of QA, Jeff Greenstein, and Christopher Hirata of QA implemented the KPMG/QA Tax Strategy. QA's employees understood that the FLIP transactions could create basis shifts affecting the investor's tax liability.

12.    Mr. McNamara of QA sent Mr. Jacoboni a letter in care of his accountant, Philip Blake, dated September 8, 1997, outlining the operational roles of the various entities involved in the KPMG/QA Tax Strategy and specifying the large wire transfers of money to effectuate the transactions. A true copy of the September 8, 1997 letter is attached as Exhibit 1 to this Second

Amended Complaint. The letter makes clear that QA would direct other institutions to carry out the KPMG/QA Tax Strategy. Based on that letter and assurances from KPMG and QA personnel, Mr. Jacoboni signed a "QA Investments, LLC Investment Advisory Agreement" dated September 10, 1997 ("QA Agreement"). A true copy of the signed QA Agreement is attached as Exhibit 2 to this Second Amended Complaint. The signed QA Agreement notes in a handwritten entry that KPMG was also retained by Mr. Jacoboni. The fact that QA directed implementation of the KPMG/QA Tax Strategy is confirmed by an undated letter from Lisa Randolph of First Union, which was sent to the following: Chris Hirata of QA; Ian Dungate of BankAmerica Trust and Banking Corporation (Cayman), Ltd. in the Cayman Islands, which managed the financial transactions through Jacaranda; Paul Lumsden of the Cayman law firm Maples & Calder, which prepared and signed various legal documents and arranged for various individuals to serve as directors of Jacaranda and other Cayman institutions; and a copy to Mr. Jacoboni. As Ms. Randolph of First Union stated in her letter, "[a]ll investment activities [on behalf of Mr. Jacoboni] will be managed by QA Investments, LLC, an affiliate of Quadra Capital Management, L.P." A true copy of the First Union letter is attached as Exhibit 3 to this Second Amended Complaint.

13.     QA directed the many activities in the Cayman Islands. QA arranged to be the investment adviser to Jacaranda. On March 23, 1998, after the KPMG/QA Tax Strategy had been effectuated, Christopher Hirata of QA wrote identical letters to Ian Dungate at BankAmerica Trust & Banking Corporation in the Cayman Islands and Paul Lumsden of the Maples & Calder law firm in the Cayman Islands. The letters explained that:

> you have received a letter from KPMG Peat Marwick describing
> their relationship with Joe Jacoboni, a proposed warrant holder of

Jacaranda Capital, Inc., a Cayman Islands company which has retained QA Investments, LLC as their investment adviser.

QA established an account for the benefit of Mr. Jacoboni with UBS and orchestrated the stock and options trades. QA also arranged wire transfers through Jacaranda in the Cayman Islands to pay substantial fees to the three members of the RICO Enterprise alleged in Count I below. For example:

- $437,500.00 was wired to KPMG's bank account in Charlotte, North Carolina on December 6, 1997, in payment of a KPMG invoice related to Mr. Jacoboni;

- $242,316 was wired to QA's bank account from Jacaranda's bank in mid-December 1997 in payment of an invoice for QA's fees;

- $50,000 was wired to Brown & Wood, LLP's bank account in payment of its invoice to Jacaranda with a copy sent to QA.

In addition, QA arranged to liquidate Jacaranda and other Cayman Islands companies after the tax strategies were consummated. From the creation to the wrapping up of the KPMG/QA Tax Strategy, QA directed and oversaw the foreign bank investments, the timing of trades, the movement of money, and the recognition of profits or losses on behalf of Mr. Jacoboni.

14. KPMG sent Mr. Jacoboni a proposed three-page engagement letter dated September 15, 1997 ("Engagement Letter"). Mr. Jacoboni did not sign the Engagement Letter in 1997 because he did not understand the KPMG/QA Tax Strategy briefly summarized in the letter. KPMG's Engagement Letter began by stating that the letter was to define the role of KPMG "in an investment strategy [and] to assist you and QA Investments LLC ("QA") as a tax advisor in connection with your participation in the Strategy." KPMG represented that it knew QA's role was as "a registered investment advisor, to provide you with investment advisory

services and trading strategies designed to permit you to acquire both directly, and indirectly, a position in the shares of a Foreign Bank." A true copy of the Engagement Letter, as eventually signed by Mr. Jacoboni in summer 1998, is attached as Exhibit 4 to this Second Amended Complaint.

15. Before the end of 1997, Mr. Jacoboni paid the necessary transaction and related fees to carry out the KPMG/QA Tax Strategy. The investment had a total initial cost of approximately $4.7 million, a return on investment of approximately $2.3 million, for a total initial cost of the investment of approximately $2.4 million. This amount included the large fees from Jacaranda paid to KPMG, QA and Brown & Wood for their services. On information and belief, QA also arranged for Jacaranda to pay fees to the law firm Maples & Calder in the Cayman Islands.

16. Mr. Jacoboni received in Florida many interstate phone calls and documents from KPMG and QA through the United States mail and via facsimile transmissions to effectuate the 1997 investments and complete Mr. Jacoboni's federal income tax return. For example, Mr. Jacoboni received from KPMG via facsimile transmission a recap of his investment in UBS prepared by QA on October 7, 1997. There were also numerous interstate facsimile transmissions and wire transfers among Mr. Jacoboni and KPMG and QA and their agents to effectuate the 1997 investments, as more fully set forth in Mr. Jacoboni's claim under the Racketeer Influenced and Corrupt Organizations Act below.

17. After the investments had been consummated in 1997, Mr. Jacoboni expected and relied upon KPMG to prepare its formal tax opinion regarding his 1997 investments and then to prepare Mr. Jacoboni's 1997 tax return. KPMG and QA prepared a letter for the signature of Mr. Jacoboni to Carolyn Branan of KPMG dated May 15, 1998. The letter was regarding "Leveraged

Investment in the stock of United [sic] Bank of Switzerland" and summarized the 1997 investments for Mr. Jacoboni ("Representation Letter"). A true copy of the two-page letter and exhibits are attached as Exhibit 5 to this Second Amended Complaint. Mr. Jacoboni had no role in preparing the Representation Letter, did not understand the overall transaction at the time, and only signed and returned it to Carolyn Branan of KPMG more than two months later because he had been told it was a prerequisite to his receiving KPMG's tax opinion and to KPMG's completing his 1997 tax return. The Representation Letter stated that QA was an investment advisor to both Jacaranda and Mr. Jacoboni. Exhibit B to the Representation Letter stated that Mr. Jacoboni "has relied upon Quadra Advisors, LLC, Quadra Capital Management, L.P., and Bank America Trust & Banking Corporation (Cayman) Ltd. to appropriately execute the activities of [Jacaranda]."

18.     On June 16, 1998, Mr. Jacoboni received a telephone call from Carolyn Branan and Craig Richie of KPMG. They pressured Mr. Jacoboni to sign and return the KPMG Engagement Letter, previously sent to him, and the Representation Letter. Mr. Jacoboni was uncomfortable with KPMG's pressure, and therefore added his lawyer, Thomas M. Dixon of Clark Hill P.L.C. law firm, onto a conference call with the KPMG officials. Mr. Richie was identified as the KPMG official responsible for producing the KPMG tax opinion regarding the 1997 investments.

19.     Both Messrs. Jacoboni and Dixon expressed their reluctance to have Mr. Jacoboni sign the Representation Letter because they did not understand it and believed that the Representation Letter was intended primarily to protect the interests of KPMG in the event its tax strategy did not survive a possible IRS audit. Mr. Richie of KPMG explained that the Representation Letter was intended by KPMG solely to protect Mr. Jacoboni's interests and to

put him in the best possible position to achieve the desired results in the event of an IRS audit. Mr. Richie assured Messrs. Jacoboni and Dixon that the KPMG Representation Letter was not prepared to insulate KPMG from liability and that KPMG is "still on the hook" if there was a problem down the road. Mr. Richie stated that KPMG would still be responsible if there was a problem or penalty as a result of a future IRS audit.

20.     Mr. Dixon explained to Ms. Branan and Mr. Richie of KPMG that it seemed ridiculous to ask Mr. Jacoboni to sign the Representation Letter, which neither he nor Mr. Jacoboni understood. Moreover, Mr. Jacoboni had no personal knowledge of the factual representations in the letter and could not verify the facts as KPMG requested. Mr. Dixon requested that Mr. Richie of KPMG call Mr. Dixon's law partner, Joe Bonventre, who is a tax lawyer. Mr. Richie insisted that KPMG would not release any tax opinion regarding the 1997 investments until Mr. Jacoboni signed and returned the Representation Letter.

21.     Despite many calls from Mr. Bonventre to Craig Richie of KPMG, Mr. Richie never returned his calls. Mr. Jacoboni found himself in the following untenable predicament:

(a)     The 1997 investment transactions had already been executed in late 1997 under the direction of KPMG and QA.

(b)     Mr. Jacoboni did not understand the facts or strategy underlying the KPMG/QA Tax Strategy, but he knew that he needed the promised tax opinion from KPMG.

(c)     Mr. Richie of KPMG failed to return phone calls from Mr. Bonventre.

(d)     KPMG took the position that preparation of Mr. Jacoboni's federal income tax return for 1997 could not be completed without the KPMG tax opinion. KPMG had

made clear that it would not release its tax opinion without receiving the Representation Letter and Engagement Letter signed by Mr. Jacoboni.

Faced with this predicament and relying on KPMG's representations and its "Blue Chip" reputation as one of the Big Five accounting firms, Mr. Jacoboni signed the Representation Letter and the Engagement Letter on July 30, 1998, and returned them to KPMG with a separate transmittal letter. *See* Exhibit 5 to this Second Amended Complaint.

22.     KPMG never delivered its promised tax opinion regarding the 1997 investments to Mr. Jacoboni. Mr. Jacoboni has since learned that other taxpayers did receive tax opinions from KPMG. Mr. Jacoboni later received a copy of a "concurring opinion" dated August 31, 1998, from the law firm Brown & Wood LLP, which was requested by Dale Baumann of KPMG. The Brown & Wood concurring opinion was mailed from New York to Mr. Jacoboni in Florida.

23.     Mr. Jacoboni cooperated with KPMG in the preparation of his 1997 federal income tax return. The return was timely filed with the IRS in October 1998 and reflected over $30 million in capital losses in 1997 from the KPMG/QA Tax Strategy.

24.     On July 26, 2001, the IRS issued Notice 2001-45 (2001-33 IRB 129) regarding "Basis Shifting Tax Shelters." The IRS notice stated that certain types of transactions utilizing foreign corporations could be subject to disallowance for tax purposes, interest on unpaid taxes, and possible penalties against taxpayers, tax return preparers and tax shelter promoters. KPMG forwarded a copy of the IRS notice and a related newspaper article to Mr. Jacoboni and his lawyer on August 17, 2001. KPMG acknowledged in phone calls and later documents that IRS Notice 2001-45 calls into question the 1997 investment strategy of KPMG and QA on Mr. Jacoboni's behalf. In fact, KPMG has itself acknowledged that Mr. Jacoboni is at risk of paying large amounts in back taxes and interest related to the 1997 investments. KPMG's statements

were an admission that it should have registered the KPMG/QA Tax Strategy as a "tax shelter" with the IRS in compliance with federal law.

25.     In late summer 2001, the IRS made a formal information request of Mr. Jacoboni and initiated an audit of his 1997 tax return. KPMG attempted to control the way in which Mr. Jacoboni responded to the IRS. Mr. Jacoboni was upset about the IRS audit and called Ms. Branan of KPMG. She offered to reduce KPMG's fees. KPMG's services have terminated and Mr. Jacoboni has engaged separate accountants in Florida.

26.     Also in late summer 2001, Ms. Branan suggested that Mr. Jacoboni negotiate a settlement with the IRS and in the meantime pay a portion of the tax to avoid penalties and minimize interest. She also admitted to Mr. Jacoboni during a phone call after issuance of IRS Notice 2001-45 that KPMG was aware at least 2 ½ years earlier that the IRS was investigating and even challenging offshore investments similar to the KPMG/QA Tax Strategy carried out by KPMG and QA on behalf of Mr. Jacoboni. Mr. Jacoboni was incredulous because, if KPMG or QA had revealed such a risk with the IRS, Mr. Jacoboni could, and would, have: (a) avoided the KPMG/QA Tax Strategy and paid the resulting federal income tax and not incurred the approximately $2.4 million in transaction fees; (b) explored other methods of minimizing his taxes; (c) reserved and set aside amounts to pay taxes, interest and penalties, if assessed; or (d) filed an amended 1997 tax return and paid the resulting taxes and avoided possible penalties. Moreover, Mr. Jacoboni would not have invested in the KPMG/QA Tax Strategy if KPMG and QA had registered it as a tax shelter with the IRS.

27.     Mr. Jacoboni learned in late 2001 and 2002 that KPMG and QA were active promoters of tax strategies that were the same or similar to that sold to Mr. Jacoboni. Such strategies were sold to many other taxpayers as early as 1996 and continuing into 2001. The IRS

is investigating some or all of such taxpayers' returns. In some cases, the IRS has issued Statutory Notices of Deficiency assessing not only additional tax and interest thereon but penalties and accompanying interest. A *New York Times* article dated July 27, 2001, forwarded to Mr. Jacoboni by Joseph DePew of KPMG's "Tax Controversy Services," reported that the IRS Notice 2001-45 focused on tax shelters involving foreign investments and capital gains avoided. The article reported the following:

> [T]ax shelter used at least 200 times by very rich Americans and corporations to evade capital gains taxes by manipulating rules on foreign investments was shut down yesterday by the Treasury Department.
>
> The hundreds, and perhaps thousands, of taxpayers who invested in the shelter are being told that their tax returns will be audited unless they file amended returns, and that the claimed losses will be disallowed, said Mark A. Weinberger, the assistant secretary for tax policy.
>
> * * * * * * * * * * * *
>
> The tax shelter promoter, whom the Treasury Department declined to identify, "marketed this to anybody with a lot of capital gain in the U.S. who wanted to offset that gain with losses,"
> Mr. Weinberger said "The promoter would come to you and say, 'We can find this foreign corporation and make an investment and through this hocus-pocus we can create losses.'"

On information and belief, the "tax shelter promoter" referred to by the Treasury Department official is KPMG and QA.

28. In late 2001, Mr. Jacoboni retained a new accountant, Mr. Dean R. Orr of the accounting firm Parks, Tschopp, Whitcomb and Orr in Maitland, Florida, to replace KPMG. Mr. Jacoboni wrote letters on December 7, 2001, and January 17, 2002, to Ms. Branan of KPMG

requesting that his files at KPMG be transferred to Mr. Orr. KPMG unreasonably delayed and stonewalled Mr. Jacoboni's requests. Finally, Mr. James M. McMahon of KPMG wrote a January 29, 2002 letter to Mr. Orr attempting to impose unreasonable conditions on Mr. Orr's access to Mr. Jacoboni's records and KPMG's related work papers. A copy of Mr. McMahon's letter is attached as Exhibit 6 to this Second Amended Complaint. KPMG later released some records relating to Mr. Jacoboni and the KPMG/QA Tax Strategy.

29.     Beginning in late 2001, Mr. Jacoboni voluntarily cooperated with the IRS's inquiries, including Mr. Jacoboni's providing documents and answering questions regarding his participation in the KPMG/QA Tax Strategy. Mr. Jacoboni cooperated with the IRS concerning its audit of his 1997 tax return to avoid or minimize the probability that the IRS would take the position that the KPMG/QA Tax Strategy was an "abusive tax shelter," that KPMG should have registered the strategy as a tax shelter, and that Mr. Jacoboni should suffer large accuracy-related tax penalties. Mr. Jacoboni made thorough and good faith disclosures to the IRS, including providing the revenue agent with a copy of the initial Complaint filed in this case on April 26, 2002.

30.     On July 9, 2002, the United States Department of Justice, on behalf of IRS, filed a petition to enforce nine IRS summonses issued to KPMG. *United States v. KPMG LLP*, Case No. 1:02MS00295 (D.D.C.) (Judge Hogan) ("IRS Petition"). Jacoboni became aware of the IRS Petition following considerable press coverage, including articles in the *New York Times* and *Wall Street Journal*. A true copy of the IRS Petition, the Declaration of IRS Revenue Agent Michael A. Halpert, and the Exhibits that accompany the Petition and Declaration were filed with Mr. Jacoboni's "Supplemental Filing in Support of Plaintiff's RICO Case Statement" filed in this case on July 12, 2002. The IRS seeks to enforce nine summonses for the production of

documents related to KPMG's promotion of tax shelters, including the Foreign Leveraged Investment Program/Offshore Portfolio Investment Strategy ("FLIP/OPIS") that was promoted and sold to Jacoboni by KPMG and QA. The Declaration of IRS Revenue Agent Halpert ("Halpert Decl.") states:

> FLIP/OPIS: According to documents produced by KPMG in response to the summons, and information obtained from IRS employees conducting audits of investors by FLIP and OPIS transactions, I have determined that approximately 160 KPMG clients invested in these transactions. So far, I have analyzed the information pertaining to 57 of those investors. That analysis shows that those 57 investors claimed aggregate losses totaling approximately $1.4 billion from investments totaling approximately $114 million.

Halpert Decl. ¶37a (emphasis added). In addition, the IRS Petition alleges, as does Jacoboni in this Second Amended Complaint and RICO Case Statement, that KPMG continues to develop and aggressively market many possibly abusive tax shelters:

> KPMG continues to market tax shelters, without complying with the registration requirements of §6111 or the summonses at issue in this lawsuit. Since I began my examination, I have received information from a confidential source that indicates that KPMG continues to hide from the IRS information about tax shelters it is now developing and marketing. Attached to this Declaration as Exhibit 4 is a letter dated May 30, 2002. According to that letter and the documents that accompanied it, KPMG continues to develop and aggressively market dozens of possibly abusive tax shelters.

Halpert Decl. ¶38 (emphasis added). The IRS Petition cited Mr. Jacoboni's Complaint favorably. Halpert Declaration at ¶23. In response to the Department of Justice's request that he cooperate with the IRS Petition, Mr. Jacoboni prepared and signed a Declaration concerning the fact that KPMG did not approach him about claiming privilege as to various documents relating to the KPMG/QA Tax Strategy. The Department of Justice filed Mr. Jacoboni's Declaration in connection with court proceedings relating to the IRS Petition.

31.    In its response to the IRS Petition, KPMG minimized its role in connection with the Jacoboni Transaction and any FLIP/OPIS Transaction and denied that the Jacoboni Transaction or any FLIP/OPIS Transaction was an abusive tax shelter. In particular, KPMG responded that: it was not "a tax 'promoter' within the meaning of § 6111(d)(2)" of the Internal Revenue Code with respect to the Jacoboni Transaction or any FLIP/OPIS Transaction; KPMG did not "organize any potentially abusive tax shelter or sell any interest in such a shelter within the meaning of § 6112(a)" of the Internal Revenue Code with respect to the Jacoboni Transaction or any FLIP/OPIS Transaction; and KPMG's "tax counseling and advice do not constitute a tax shelter or an entity, investment plan, or arrangement within the meaning of § 6112(b)" of the Internal Revenue Code with respect to the Jacoboni Transaction or any FLIP/OPIS Transaction. KPMG stated further that it did not "aid, assist, procure, or advise with respect to any document that could be used by a taxpayer to understate such person's tax liability for purposes of § 6701" of the Internal Revenue Code with respect to the Jacoboni Transaction or any FLIP/OPIS Transaction.

32.    On October 4, 2002, the IRS issued a formal settlement offer for taxpayers invested in the FLIP/OPIS strategies, including Mr. Jacoboni, to avail themselves of IRS Announcement 2002-97, 2002 43 IRB 757 (Oct. 28, 2002). The IRS Announcement permits taxpayers to recognize approximately 20% of their claimed capital losses, and potentially avoid penalties, relating to the FLIP/OPIS strategies. Mr. Jacoboni is actively negotiating with the IRS in accordance with Announcement 2002-97 and he committed to a settlement with the IRS concerning his tax liability for 1997 before the deadline of December 3, 2002.

## COUNT I
### (Racketeer Influenced and Corrupt Organizations Act)

33.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

34.     This RICO claim arises under 18 U.S.C. §§1962(c) and (d).

35.     At all relevant times, KPMG was a "person" within the meaning of 18 U.S.C. §1961(3), as KPMG was "capable of holding a legal or beneficial interest in property."

36.     At all relevant times, QA was a "person" within the meaning of 18 U.S.C. §1961(3), as QA was "capable of holding a legal or beneficial interest in property."

37.     At all relevant times, KPMG, QA, and Brown & Wood, LLP constituted an "Enterprise" within the meaning of 18 U.S.C. §1961(4).  In its tax consulting business, KPMG closely works with QA for QA to handle the "economic substance" of the transactions and to oversee the operational steps and payment of money.  Brown & Wood coordinated closely with KPMG and rendered legal opinions for the other two co-conspirators with regard to tax consulting.  In this case, Brown & Wood issued a concurring opinion on the tax strategy devised by KPMG and QA.

38.     The purpose of the Enterprise is to solicit and represent clients and maximize profits through the fees charged for KPMG's and QA's services.  There are some legitimate services offered by KPMG, QA, and Brown & Wood that exist separately and apart from the illegal pattern of activity in which Defendants also engage, as set forth in detail in this Second Amended Complaint.  The Enterprise functions as a well-planned tax avoidance scheme. Initially, a prospective client seeks tax advice.  KPMG involves QA for the actual investment, which is expected to generate a positive return or to yield a capital loss that offsets capital gain

from other transactions. KPMG and QA then work together to effectuate the complex transactions and for KPMG to prepare the tax return. In this case, Brown & Wood was retained in an attempt to deflect any IRS challenges by issuing its concurring tax opinion. The Enterprise is an ongoing organization. The Enterprise has an ascertainable structure and purpose beyond the scope of the predicate acts and their conspiracy to commit such acts. The Enterprise has engaged in, and its activities have affected, interstate and foreign commerce. Each Defendant has been associated with the Enterprise. Each Defendant helped to direct the Enterprise's actions and manage its affairs. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

39. Defendants' multiple predicate acts of racketeering include mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Defendants engaged in multiple schemes to defraud consumers by marketing, establishing, and promoting tax avoidance benefits and willfully misrepresenting or failing to disclose material facts about "tax strategies" to such clients. Defendants executed or attempted to execute such schemes through the use of the United States mails and through transmissions by wire in interstate commerce. KPMG and QA committed many predicate acts from September 1997 through January 2002 in furtherance of their scheme to defraud Mr. Jacoboni:

(a) In September 1997, Carolyn Branan of KPMG told Jacoboni during an interstate telephone call that (1) the KPMG/QA Tax Strategy was a "no lose" proposition, as he would either make money or incur capital losses to reduce his possible capital gains taxes; (2) the strategy was a "clean deal, never audited"; (3) KPMG would provide him with a "more likely than not" tax opinion to protect him; (4) the strategy was "bullet proof" because it "uses IRS's

own law against them [sic]"; and (5) that the strategy strictly complied with IRS rules and regulations. Not only was KPMG wrong, but at the time KPMG made the statements it had knowledge that IRS was opposed to the tax avoidance strategy.

(b)     On September 15, 1997, KPMG sent Jacoboni a three-page Engagement Letter. Jacoboni did not immediately sign the letter because, as KPMG was aware, Jacoboni did not agree to the terms of the letter. The letter was incidental to the scheme to defraud. *See* Exhibit 4.

(c)     QA directed wire transfers from Mr. Jacoboni to New York bank branches, which then forwarded funds overseas to the London branch of UBS and to the Cayman Islands bank account for Jacaranda to carry out the KPMG/QA Tax Strategy. For example, in late September 1997 QA arranged for large wire transfers out of Mr. Jacoboni's trust account: $1,250,000 to a UBS account in New York, for the account of the London branch of UBS; and $2,450,000 to BankAmerica International in New York for the benefit of Jacaranda in the Cayman Islands.

(d)     KPMG drafted and mailed to Jacoboni the Representation Letter on May 15, 1998 that it directed him to sign. KPMG knew that the statements, regarding Jacoboni's knowledge of the transactions, his ability to report the structure of the transactions to KPMG, the agency arrangements involved and the status of all corporations involved, were false and intentionally deceptive. *See* Exhibit 5.

(e)     QA directed when and how Jacaranda would go "through the liquidation process." By a facsimile wire transmission on June 10, 1998, Christopher Hirata of QA directed Ms. Rayvonne Bethel of BankAmerica Trust & Banking in the Cayman Islands to process "the next batch of companies going through the liquidation process." Jacaranda is listed, but QA has

redacted the names of the other companies that were going through the "liquidation process" in furtherance of KPMG's pattern of racketeering activity and scheme to defraud Mr. Jacoboni and other investors in FLIP/OPIS Transactions.

(f)     On June 16, 1998, Branan and Richie of KPMG both called Jacoboni to explain the Representation Letter. During the phone call, Mr. Richie claimed the letter: (1) was intended solely to protect Jacoboni's interests, in the event of an IRS audit; (2) was not prepared to insulate KPMG from liability; and (3) did not change the fact that KPMG was "still on the hook" and would still assume responsibility if there was a problem or penalty resulting from any future IRS audit. KPMG has since disavowed having any obligation or responsibility to Jacoboni. *See* Exhibit 6.

(g)     On July 30, 1998, Jacoboni succumbed to KPMG's pressure. Relying on Richie's representations and because he needed the KPMG tax opinion for KPMG to prepare and file his 1997 tax return, Jacoboni reluctantly signed the Representation Letter and Engagement Letter, which were replete with  false information regarding his personal knowledge of the KPMG/QA Tax Strategy. That same day and at KPMG's prior direction, Jacoboni placed the letter in the U.S. Mail.

(h)     On August 31, 1998, Brown and Wood, LLP sent a concurring tax opinion via U.S. Mail to Jacoboni at KPMG's direction. The opinion was premised on factual representations that KPMG knew to be false.

(i)     In 1998, KPMG knowingly prepared an illegal and fraudulent tax return for Jacoboni. KPMG was aware that Jacoboni would rely on its representation of this tax return as legal and place it in the mail. Jacoboni filed his 1997 tax return by placing it in the U.S. Mail in October 1998.

(j)     In late summer 2001, following the IRS Notice, Branan attempted to conceal KPMG and QA's fraudulent scheme by recommending that Jacoboni negotiate a settlement with the IRS and pay a portion or all of the tax to avoid penalties and interest.

(k)     By letter dated January 29, 2002, McMahon of KPMG further attempted to conceal KPMG's and QA's fraudulent scheme by seeking to limit Jacoboni's new accountant's use of Jacoboni's tax records, falsely suggesting that KPMG relied upon Jacoboni for information relating to the KPMG/QA Tax Strategy, and contradicting KPMG's prior statements whereby it assumed responsibility should IRS ever question the strategy. *See* Exhibit 6.

40.     KPMG and QA engaged in multiple schemes to defraud consumers by marketing, establishing, and promoting tax avoidance benefits and willfully misrepresenting or failing to disclose material facts about "tax strategies" to such consumers. KPMG and QA also conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d). Many phone calls, mailings, facsimile transmissions and wire transfers were made across state lines from North Carolina to Florida, and New York to Florida and North Carolina, which meet the minimum burden of showing an effect on interstate commerce. In addition, the transactions included offshore investments in a Cayman Islands corporation and purchases and sales of shares in Union Bank of Switzerland, a large Swiss bank, which involved mailings and wire transfers that affected foreign commerce.

41.     Defendants' acts form a "pattern" of racketeering activity. They have been related in their common objectives to maximize profits, conspire to evade the internal revenue law by marketing and establishing "tax strategies" through use of false and misleading information, and conspire to defraud clients regarding the tax consequences of such strategies. These acts have had the same or similar purposes, results, participants, victims, and methods of commission.

Defendants' pattern of racketeering activity dates from at least mid-1997 and continues to the present, and threatens to continue in the future. The predicate acts of the Defendants all are clearly related to the effort to fraudulently induce unsuspecting clients into using the KPMG/QA Tax Strategy or the FLIP/OPIS Transaction. Defendants were in the business of marketing this and similar tax shelters to thousands of potential investors. Defendants have engaged in the unlawful conduct over the years and have depended on it as a major source of business and profit. The predicate acts involve different victims at different points in time, all as one aspect of the Defendants' way of doing business.

42. KPMG and QA participated since fall 1997 and through 2002 in a pattern of racketeering adversely affecting Mr. Jacoboni and similarly situated clients. KPMG voluntarily sent to Mr. Jacoboni a copy of an article describing the IRS's crackdown on the tax strategy involving "hundreds, and perhaps thousands, of taxpayers who invested in the shelter." Second Amended Complaint ¶27. The predicate acts of KPMG and QA all are clearly related to the effort to fraudulently induce unsuspecting clients into using the KPMG/QA Tax Strategy. Mr. Jacoboni and his counsel have learned that the transactions denoted as the KPMG/QA Tax Strategy were called the "Foreign Leveraged Investment Program" ("FLIP") within KPMG and were marketed and "sold" to many high net worth individuals over several years. It was standard operating procedure for KPMG and QA to demand that their clients sign nondisclosure agreements concerning FLIP/OPIS. Many of these individuals have retained legal counsel, who are participating in a "Global Settlement Group" in discussions with the IRS. For example, an article in *Forbes* magazine reported that the IRS "says hundreds of wealthy taxpayers. . . used variants of the same tax shelter to generate <u>several billion dollars in artificial capital losses, which then offset 'real gains'</u>." *Forbes*, April 1, 2002, at 40 (emphasis added).

43.    The IRS Petition in *United States v. KPMG LLP*, Case No. 1:02MS00295 (D.D.C.) and accompanying privilege log prepared by KPMG reveal the names of approximately 160 other taxpayers who were solicited and fraudulently induced into investing in FLIP/OPIS transactions.   There are written agreements and engagement letters between KPMG and QA relating to the development, promotion and implementation of the KPMG/QA Tax Strategy to Mr. Jacoboni and similarly situated taxpayers.   Moreover, the Halpert Declaration Exhibit 4, a May 30, 2002 letter from a confidential source to the IRS, describes that KPMG continues to "aggressively" promote tax strategies that lack any economic substance despite the IRS investigation.

44.    Encouraged and enriched by its success in 1997 promoting the KPMG/QA Tax Strategy to Mr. Jacoboni and FLIP or OPIS Transactions to other taxpayers, KPMG increased its promotional efforts in 1998.   KPMG aggressively marketed its tax strategies at a  "Wealth Management" seminar sponsored by KPMG in Phoenix, Arizona in 1998.   The seminar was targeted at high net worth individuals, both existing and prospective KPMG clients, who might be vulnerable to KPMG's marketing of tax avoidance "products."   KPMG promoted its tax strategies as using IRS's complex rules against it.   KPMG touted the investment advisory role of QA and another firm formed by principals who left QA, Presidio Advisors, LLC.   Based on the KPMG Wealth Management conference and extensive promotional efforts by Carolyn Branan and others at KPMG, many taxpayers were defrauded into participating in FLIP or OPIS Transactions in 1998 and 1999.

45.    The pattern of racketeering activity caused damages to other clients of KPMG and QA, who were defrauded by KPMG's and QA's failure to disclose the substantial tax risks involved in connection with the marketed tax strategies and KPMG's and QA's assurances that

the tax strategies were legitimate tax avoidance steps that did *not* have to be registered as tax shelters with the IRS. These other clients describe that KPMG and QA made fraudulent misrepresentations and omissions to them that were substantially similar to those detailed in Paragraphs 8, 9, 10, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, and 28 of this Second Amended Complaint. These other clients describe that many of the same KPMG and QA personnel who were involved in the Jacoboni Transaction, as described in Paragraphs 8, 11, 12, 13, 17, 18, 19, 20, 21, 22, 25, 26, 27, and 28 of this Second Amended Complaint, were also involved and performed similar roles in their respective transactions. These other clients describe that their tax strategies were marketed, orchestrated, and implemented by KPMG and QA in a manner substantially similar to the activities described in Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 19 of this Second Amended Complaint. Over 20 individuals have asserted that they were also victims of KPMG's and QA's scheme to defraud:

(a)    The Green Brothers

James and Robert Green are brothers who reside in the Charlotte, North Carolina area. Their 1997 tax strategy promoted and carried out by KPMG and QA is stunningly similar to the FLIP transaction of Jacoboni.

The Green brothers sold their fast food businesses in 1997. First Union Bank introduced the Green brothers to KPMG for tax consulting. At KPMG's request, the Green brothers met with Carolyn Branan and Dale Baumann in KPMG's offices in Charlotte, North Carolina, along with representatives of QA, in early September 1997. Ms. Branan and Mr. Baumann pitched the FLIP tax strategy that "works great" and is "risk free," but never disclosed any tax risks associated with the strategy. They were told by KPMG that FLIP was "proprietary" and that they could not disclose it to anyone else, even their lawyer or regular accountant. The QA

26

representatives in attendance did not correct or disagree with any parts of KPMG's promotion of the FLIP strategy.

The Greens' transactions were almost identical to those of Jacoboni: (1) both KPMG and QA promoted, carried out, and directed the money for the transactions; (2) the offshore trades were in stock of Union Bank of Switzerland; (3) the money flowed through a Cayman Islands corporation, Glen Eagle Capital, Inc. ("Glen Eagle") supervised by QA; (4) Glen Eagle's funds flowed through accounts at Bank of America (Caymans) Ltd.; (5) the Greens were required to purchase warrants in Glen Eagle; (6) the law firm Brown & Wood issued a tax opinion; (7) the transactions occurred in 1997 and related to capital gains of approximately $20 million; and (8) KPMG prepared the joint tax returns for the Green brothers and their respective wives.

The FLIP strategy was effectuated through the U.S. Mail and interstate wire transfers. For example, on September 18, 1997, QA directed that Jim Green transfer $700,000 to the Glen Eagle account in the Cayman Islands. There was also a September 27, 1997 wire transfer to UBS from the Glen Eagle account and a November 13 wire transfer to Morgan Stanley in New York. The next year, KPMG issued its tax opinion to the Green brothers on June 8, 1998 through the U.S. Mail and Brown & Wood sent its concurring opinion dated June 15, 1998, through the U.S. Mail from New York to Charlotte.

The Green brothers and their wives' joint tax returns are under audit by the IRS. The Greens have elected to participate in the IRS settlement offer under Announcement 2002-97. The Greens have been injured by KPMG's and QA's aggressive and fraudulent promotion of the FLIP strategy and KPMG's and QA's failure to disclose the risks involved.

(b)    Michael and Jill Sullivan

The FLIP transaction promoted and carried out by KPMG and QA for Michael J. and Jill P. Sullivan was also remarkably similar to the Jacoboni KPMG/QA Tax Strategy. Mr. and Mrs. Sullivan reside in Key Largo, Florida. When Mr. Sullivan sold his business in 1998, he was approached by First Union Bank to determine whether he was interested in tax consulting. When he expressed interest, Mr. Sullivan was introduced to Carolyn Branan of KPMG and Ralph Lovejoy of QA. Mr. Sullivan has since learned that Branan of KPMG and Lovejoy of QA are married to one another.

Carolyn Branan and William ("Sandy") Spitz of KPMG told Mr. Sullivan that the FLIP tax strategy was a solid, "no lose" investment. When Mr. Sullivan requested that he be permitted to have his lawyer review the strategy, they told him he could not because it was "proprietary."

The FLIP tax strategy for the Sullivans was very similar to the KPMG/QA Tax Strategy for Jacoboni: (1) KPMG and QA promoted, carried out, and directed the money for the underlying transactions; (2) the trades were in stock of Union Bank of Switzerland; (3) the transaction expenses and fees flowed through a Cayman Islands corporation, Stonebridge Capital, Inc. ("Stonebridge") supervised by QA; (4) Stonebridge's funds flowed through accounts at Bank of America Trust (Cayman) Ltd.; (5) the Sullivans were required to purchase a warrant in Stonebridge; (6) the transactions occurred in 1998, one year later than the KPMG/QA Tax Strategy of Jacoboni; and (7) the transactions related to capital gains of approximately $16.5 million.

The FLIP strategy was effectuated through the U.S. Mail and interstate wire transfers to UBS bank accounts in New York. For whatever reason, KPMG did not issue a tax opinion related to the Sullivan's FLIP strategy. Instead, PricewaterhouseCoopers LLP issued a tax

opinion dated October 6, 1999, which was mailed from New York to the Sullivans in Key Largo, Florida.

Mr. and Mrs. Sullivan's federal tax return for 1998 is under audit by the IRS. When Mr. Sullivan and his tax lawyer requested, both orally and in writing, that KPMG give its recommendation on whether the Sullivans should elect to participate in the IRS settlement offer under IRS Announcement 2002-97, KPMG refused to give any advice. Mr. and Mrs. Sullivan have elected by the December 3, 2002 deadline to participate in the IRS settlement offer. The Sullivans have been injured by KPMG's and QA's aggressive and fraudulent promotion of the FLIP strategy and their fraudulent failure to disclose the risks involved.

(c)    The Thorpes

Mr. A.P. ("Sandy") Thorpe, III of Rocky Mount, North Carolina was President of a family closely held "C Corporation," Thorpe & Company, Inc. of Rocky Mount ("Thorpe & Co.") based in Rocky Mount. Sandy Thorpe and his children, A.P. Thorpe, IV of Wrightsville Beach, North Carolina, and Gray Thorpe Dixon of Edenton, North Carolina, owned 100% of the shares of Thorpe & Co. For many years, KPMG was the outside financial accountant for Thorpe & Co. and for Sandy Thorpe personally. KPMG had a fiduciary relationship with Thorpe & Co. and its shareholders based on its complete access to the business plans and financial information of Thorpe & Co. and its shareholders and knowing the trust and confidence Sandy Thorpe and his children placed in KPMG.

KPMG strongly recommended to the Thorpes an OPIS investment strategy which is very similar to the one recommended to Mr. Jacoboni. The Transaction was effectuated in 1998 and involved Deutsche Bank stock. KPMG failed to disclose any material income tax risk in this strategy and refused to let any of the Thorpes consult with their long-time attorneys and have

such attorneys review any of the operative documents even though these attorneys offered to sign a confidentiality agreement. The Thorpes acted upon KPMG's recommendations and now face large tax liabilities notwithstanding the Thorpes electing to participate in the IRS settlement offer under Announcement 2002-97.

Sandy Thorpe requested, via letters in Federal Express and by facsimile, that KPMG give its recommendations whether the Thorpes should elect to participate in the IRS settlement, but KPMG refused to give any recommendations. Despite their requests, KPMG also has refused to return the files of Thorpe & Co. and Sandy Thorpe. The Thorpes have been injured by KPMG's aggressive promotion of the OPIS investment strategy, KPMG's fraudulent failure to disclose the risks involved and KPMG's use of the U.S. Mail and wire transfers to promote and effectuate the transactions that have led to a large tax liability for the Thorpes' respective federal income tax returns for 1998. Several of the operation documents were mailed to the Thorpes and several stages of the OPIS transaction funded with wire transfers.

(d)    Messrs. Houser and Rogers

Mr. Charles Houser and Mr. William M. Rogers were business partners in a closely held telecommunications company based in Greenville, South Carolina. KPMG served as the company's regular outside accountant and the personal accountant for Mr. Houser. KPMG was in a position of trust and fiduciary duty in light of its complete access to the company's business plans and financial information.

In 1998 KPMG's employee, William Spitz, called Mr. Houser via an interstate telephone call regarding a "business opportunity" that might be beneficial considering their position following the sale of their telecom company. Mr. Spitz then met in Greenville to pitch the FLIP tax strategy to Messrs. Houser and Rogers. Mr. Spitz would not permit Messrs. Houser or Rogers

to have anyone else evaluate the recommended FLIP tax strategy, but Mr. Spitz represented that KPMG "has presented this strategy to its clients all over the country" and that "some clients made over $700,000." Mr. Spitz gave his oral assurance that the FLIP strategy met the IRS rules and regulations. KPMG never advised Messrs. Houser and Rogers of the risks of the FLIP tax strategy or that they might be subject to increased tax liability and possible penalties.

Mr. Rogers later requested a tax opinion letter from Mr. Spitz and KPMG as they had assured him they would give him a favorable opinion letter on the tax aspects of the transaction. At a later meeting in 1999 with Mr. Spitz in Greenville, Spitz told Mr. Rogers that he did not have a written legal opinion concerning the FLIP tax strategy. That was a misrepresentation because Mr. Spitz personally and KPMG as a company were aware that written legal opinions were available within KPMG at the time Mr. Spitz made the misrepresentation. In order to effectuate the FLIP tax strategy, Mr. Spitz periodically called Mr. Houser and Mr. Rogers in late 1998 via interstate phone calls to send checks via U.S. Mail or complete wire transfers of funds in order to effectuate the FLIP strategy.

QA Investments assisted KPMG in carrying out the FLIP tax strategy by establishing a Cayman Island corporation through which stock and warrant transactions were routed, trading in UBS stock, and otherwise consummating the transactions via U.S. Mail and interstate telephone calls and wire transfers.

Messrs. Houser and Rogers have elected to participate in the IRS settlement offer under Announcement 2002-97. Despite their request for assistance, KPMG refused to recommend whether they should participate in the IRS settlement.

(e)     Other RICO Victims

- A grandfather, his children, and his grandchildren residing in South Carolina invested in a KPMG and QA Tax Strategy in 1998:

  * Thomas Walter Brashier
  * Kathy Brashier Duncan
  * William Benjamin Duncan
  * Thomas Walter Brashier, Jr.
  * Thomas Walter Brashier, III
  * Martin Timothy Brashier
  * Samuel Wesley Brashier
  * James Ted Brashier
  * James Brian Duncan
  * Christy Lynn Brashier
  * James Matthew Brashier
  * Emily Caroline Brashier
  * Daniel McKinney Brashier

- The Estate of Francis M. Hipp, which was invested in the same tax shelter as the Brashier family above.

- Bruce Richbourg, residing in South Carolina, invested in a KPMG and QA tax strategy in 1998.

Other individuals have requested that their identities not be disclosed at this time because this Second Amended Complaint will be a matter of public record. These present and former clients of KPMG may be amenable, however, to disclosing their identities to KPMG and QA pursuant to an appropriate Confidentiality Order. That being said, KPMG and QA are in possession of information regarding these clients and their tax strategies. In response to threats of lawsuits arising from the FLIP/OPIS Transaction, KMPG has entered into tolling agreements, suspending applicable statutes of limitation, with former clients who, like Mr. Jacoboni, regard themselves as victims of KPMG's scheme to defraud. Mr. Jacoboni has specifically requested in discovery, served on September 18, 2002 on KPMG and September 20, 2002 on QA, information regarding other threats of lawsuits, demands for payment, and/or demands for indemnification relating to

the FLIP/OPIS Transactions. However, KPMG and QA have wholly objected to this discovery and refused to identify any former clients who have threatened litigation or demanded relief relating to the FLIP/OPIS Transaction. Many other KPMG and QA clients, who were specifically identified by name on the FLIP/OPIS Summons Privilege Log prepared by KPMG relating to the IRS Petition, were also victims of KPMG's and QA's scheme to defraud and pattern of racketeering activity.

46. The pattern of racketeering activity, including the mail and wire fraud, were all committed in an effort to induce Jacoboni to invest in the transactions and in turn pay over $2.4 million in fees and related expenses to the Enterprise. Jacoboni acknowledges that the Enterprise may engage in certain legitimate business of tax planning and investment consultation. His allegation remains, however, that along with providing legitimate tax planning and investment advice, the Enterprise also misleads clients into investing in tax shelters without disclosing the substantial risks involved.

47. As described throughout this Second Amended Complaint, KPMG's and QA's mail and wire fraud were committed by defrauding customers, misrepresenting material facts, and failing to disclose material risks. Had it not been for those intentional misrepresentations, Mr. Jacoboni would not have invested in the KPMG/QA Tax Strategy. This would have saved him $2.4 million in fees, prevented an IRS audit, avoided the need to hire a new accountant and to incur legal fees, and avoided the need to pay additional tax liability, interest, and perhaps penalties. Mr. Jacoboni would also have been able to pursue more reasonable and less risky tax avoidance strategies. The conduct of KPMG and QA was the direct and immediate cause of Mr. Jacoboni's misinformed decision to invest his money in the fraudulent KPMG/QA Tax Strategy.

KPMG and QA conspired to defraud Mr. Jacoboni and other taxpayers in violation of 18 U.S.C. §1962(d).

48.     As a direct and proximate result of KPMG's and QA's violations of 18 U.S.C. §§1962(c) and (d), Mr. Jacoboni and others have been injured in their business and property. Pursuant to 18 U.S.C. §1962(c), Mr. Jacoboni seeks recovery of treble damages, the costs of bringing this lawsuit, and reasonable attorneys' fees.

**COUNT II**
**(Breach of Contract by KPMG)**

49.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

50.     Mr. Jacoboni and KPMG entered into one or more agreements under which KPMG agreed to satisfactorily perform professional accounting, financial planning, and tax consulting services for Mr. Jacoboni.

51.     Mr. Jacoboni fully performed all of his obligations to KPMG under such agreements.

52.     KPMG materially breached its obligations under the agreements by not informing Mr. Jacoboni of the IRS position that there were very substantial risks associated with the KPMG/QA Tax Strategy and that Mr. Jacoboni could be subject to disallowance of capital losses, resulting in higher income taxes and interest, as well as potential penalties by the IRS.

53.     KPMG materially breached its obligations under the agreements by failing to prepare and deliver to Mr. Jacoboni the promised KPMG tax opinion, by withholding any promised tax opinion while Mr. Jacoboni was under undue duress to accomplish the KPMG/QA Tax Strategy, by failing to provide services in good faith and in a non-negligent manner, by

improperly withholding Mr. Jacoboni's business records and KPMG's related work papers when Mr. Jacoboni retained a new accountant, and by other acts and omissions including those acts and omissions previously alleged.

54.     KPMG's acts and omissions alleged above constitute a breach of contract.

55.     As a direct and proximate result of KPMG's breach of the contract, Mr. Jacoboni has incurred economic and consequential damages.

## COUNT III
### (Accountant Malpractice by KPMG)

56.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

57.     KPMG owed a duty to Mr. Jacoboni to use the skill and care of a reasonably competent accountant and tax consultant.

58.     KPMG owed a duty to Mr. Jacoboni to perform professional accounting, financial planning and tax consulting services in a proper, skillful and careful manner.

59.     KPMG intentionally, recklessly and/or with gross negligence breached its duty owed to Mr. Jacoboni to act with the care and skill of a reasonably competent accountant and tax consultant.

60.     KPMG intentionally, recklessly and/or with gross negligence breached its duty owed to Mr. Jacoboni by other acts and omissions including those acts and omissions previously alleged.

61.     KPMG's breach of duty alleged above constitutes malpractice.

62.     As a direct and proximate result of KPMG's malpractice, in violation of the standard of care or skill required of a reasonably competent accountant and tax consultant, Mr. Jacoboni has incurred economic and consequential damages.

## COUNT IV
### (Fraud by KPMG)

63.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

64.     In its communications with Mr. Jacoboni, KPMG made numerous intentional misrepresentations and engaged in numerous material omissions in marketing, establishing and receiving funds for the KPMG/QA Tax Strategy.

65.     KPMG's intentional misrepresentations to Mr. Jacoboni include but are not limited to: that KPMG would prepare and deliver to Mr. Jacoboni a formal tax opinion; that the KPMG/QA Tax Strategy was a "no lose" proposition in that Mr. Jacoboni would make money or incur large capital losses on the investments to offset against his capital gains; that the KPMG/QA Tax Strategy complied with applicable law and did not present undue and unreasonable risks; that the KPMG/QA Tax Strategy was a "clean deal, never audited" by the IRS; that the KPMG Representation Letter was not intended to insulate KPMG from liability and that KPMG was still "on the hook" if any problems developed with the IRS; that KPMG would prepare Mr. Jacoboni's 1997 federal income tax return using the skill and care of a reasonably competent accountant and tax consultant; that the tax avoidance and wealth preservation benefits relating to the KPMG/QA Tax Strategy were achievable; and that there were minimal legal and financial risks associated with the KPMG/QA Tax Strategy.

66.     KPMG's intentional misrepresentations and material omissions were deliberate, fraudulent and made in bad faith with intent to deceive.

67.     KPMG knew, or a review of available information in KPMG's possession would have revealed, that the representations by KPMG were false and that omissions by KPMG were material.

68.     KPMG intended that Mr. Jacoboni would rely, act upon and be defrauded by KPMG's intentional misrepresentations and material omissions.

69.     KPMG had knowledge that, by KPMG's excluding other advisors, Mr. Jacoboni would probably rely upon the intentional misrepresentations and material omissions and that such reliance would likely cause Mr. Jacoboni to suffer injury.

70.     Mr. Jacoboni was justified in his reliance upon KPMG's intentional misrepresentations and material omissions due to KPMG's apparent experience and expertise and his own lack of sophistication in tax matters.

71.     Through KPMG's intentional and bad faith misrepresentations and material omissions, and Mr. Jacoboni's actual and justified reliance, KPMG committed fraud.

72.     As a direct and proximate result of KPMG's fraud, Mr. Jacoboni suffered damages.

## COUNT V
### (Negligent Misrepresentation by KPMG)

73.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

74.     KPMG owed a duty of care to Mr. Jacoboni.

75.    KPMG's duty of care required the transmittal of accurate and not misleading information from KPMG to Mr. Jacoboni.

76.    To the extent that its misrepresentations to Mr. Jacoboni were not intentional, KPMG made numerous grossly negligent misrepresentations in marketing, establishing and receiving funds for the KPMG/QA Tax Strategy.

77.    KPMG's grossly negligent misrepresentations to Mr. Jacoboni include but are not limited to: that KPMG would prepare and deliver to Mr. Jacoboni a formal tax opinion; that the KPMG/QA Tax Strategy was a "no lose" proposition in that Mr. Jacoboni would make money or incur large capital losses on the investments to offset against his capital gains; that the KPMG/QA Tax Strategy was a "clean deal, never audited" by the IRS; that the KPMG Representation Letter was not intended to insulate KPMG from liability and that KPMG was still "on the hook" if any problems developed with the IRS; that KPMG would prepare Mr. Jacoboni's 1997 federal income tax return using the skill and care of a reasonably competent accountant; that the tax avoidance and wealth preservation benefits relating to the KPMG/QA Tax Strategy were achievable; and that there were minimal legal and financial risks associated with the KPMG/QA Tax Strategy.

78.    To the extent that KPMG's misrepresentations were not made intentionally, Defendant KPMG's misrepresentations were made with reckless and grossly negligent disregard for the truth.

79.    KPMG knew, or a review of available information in KPMG's possession would have revealed, that the representations by KPMG were false.

80.    KPMG intended that Mr. Jacoboni would rely or act upon KPMG's grossly negligent misrepresentations.

38

81. KPMG had knowledge that Mr. Jacoboni would probably rely upon the negligent misrepresentations and that such reliance would likely cause Mr. Jacoboni to suffer injury.

82. Mr. Jacoboni was justified in his reliance upon KPMG's grossly negligent misrepresentations due to KPMG's apparent experience and expertise and his own lack of sophistication in tax matters.

83. As a direct and proximate result of KPMG's grossly negligent misrepresentations, Mr. Jacoboni suffered damages.

### COUNT VI
### (Promissory Estoppel against KPMG)

84. Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

85. By its statements and its conduct, KPMG made clear and unambiguous promises: that it would prepare and deliver to Mr. Jacoboni a formal tax opinion; that the KPMG/QA Tax Strategy was a "no lose" proposition in that Mr. Jacoboni would make money or incur large capital losses on the investments to offset against his capital gains; that the KPMG/QA Tax Strategy complied with applicable law and did not present undue and unreasonable risks; that the KPMG/QA Tax Strategy was a "clean deal, never audited" by the IRS; that the KPMG Representation Letter was not intended to insulate KPMG from liability and that KPMG was still "on the hook" if any problems developed with the IRS; and that KPMG would prepare Mr. Jacoboni's 1997 federal income tax return using the skill and care of a reasonably competent accountant.

86.     Mr. Jacoboni reasonably relied upon KPMG's promises and conduct in allowing the KPMG/QA Tax Strategy to be carried out and in cooperating with KPMG in its preparation of his 1997 income tax return.

87.     KPMG knew or reasonably should have known that its promises and conduct would induce Mr. Jacoboni's actions and reliance.

88.     Mr. Jacoboni has suffered and will continue to suffer economic and consequential damages from KPMG's promises and conduct and is entitled to be indemnified and reimbursed by KPMG for any and all interest and penalties assessed against Mr. Jacoboni by the IRS relating to Mr. Jacoboni's 1997 federal income tax return.

## COUNT VII
### (Florida Deceptive and Unfair Trade Practices Act against KPMG and QA)

89.     Mr. Jacoboni repeats and realleges the previous paragraphs one (1) through thirty-two (32) herein by reference.

90.     This claim for relief is asserted against KPMG and QA and arises under Fla. Stat. § 501, the Florida Deceptive and Unfair Trade Practices Act.

91.     In their marketing of certain tax "strategies" to prospective consumers, KPMG and QA have engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Fla. Stat. § 501.204(1).

92.     KPMG and QA informed consumers that the tax "strategies" they had designed were within the legal boundaries as determined by the IRS. This practice amounted to deception and unfair trade practices, as KPMG and QA knew that there was a distinct probability that the "strategies" they had developed would be found unlawful by the IRS, yet they did not inform their consumers of this probability.

93.     This practice of deceptively marketing tax "strategies" is one that was likely to mislead consumers acting reasonably in the same circumstances as Mr. Jacoboni.

94.     As a direct and proximate result of Defendants KPMG's and QA's unfair and deceptive trade practices, Mr. Jacoboni and others have been injured in their business and property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joseph J. Jacoboni respectfully prays that this Court enter judgment in his favor as follows:

(1)     As to all Counts, ordering that Defendants KPMG and QA indemnify and reimburse Mr. Jacoboni for any and all additional tax liability, interest and penalties assessed against Mr. Jacoboni by the IRS relating to Mr. Jacoboni's 1997 federal income tax return;

(2)     As to all Counts, awarding Mr. Jacoboni over $2.4 million in damages against KPMG and QA for the transaction and related fees associated with the KPMG/QA Tax Strategy paid by Mr. Jacoboni;

(3)     As to Count I, treble damages against KPMG and QA under the federal RICO Act;

(4)     As to Count IV, punitive damages against KPMG for its fraudulent representations and omissions;

(5)     As to all Counts, Mr. Jacoboni's accounting, tax consulting and other professional fees;

(6)     As to all Counts, Mr. Jacoboni's costs and prejudgment interest;

(7)     As to Counts I, IV and VII, Mr. Jacoboni's attorney's fees; and

(8)     Such other and further relief this Court deems just and equitable.

41

Dated: December 16, 2002

Respectfully submitted,

Frank A. Hamner, Esq.
Florida Bar No. 0059153
GRAY, HARRIS & ROBINSON, P.A.
Suite 1400, 301 East Pine Street
Post Office Box 3068
Orlando, Florida 32802-3068
(407) 843-8880 Telephone
(407) 244-5690 Facsimile

and

Campbell Killefer
Damon W.D. Wright
VENABLE, BAETJER, HOWARD
 & CIVILETTI, LLP
1201 New York Avenue, N.W. Suite 1000
Washington, D.C. 20005
(202) 962-4800 Telephone
(202) 962-8300 Facsimile

Counsel for the Plaintiff
Joseph J. Jacoboni

### JURY DEMAND

Plaintiff Joseph J. Jacoboni hereby demands a trial by jury on all issues triable before a

jury.

Frank A. Hamner

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Second Amended Complaint was served by the

indicated methods upon Defendants' counsel this 16th day of December 2002:

| | |
|---|---|
| W.L. KIRK, JR., ESQUIRE | THOMAS K. EQUELS, ESQUIRE |
| Florida Bar No. 0111973 | Florida Bar No. 304735 |
| MICHAEL D. BEGEY, ESQUIRE | MARY TERESA KOGUT, ESQUIRE |
| Florida Bar No. 0120928 | Florida Bar No. 332501 |
| RUMBERGER, KIRK & CALDWELL | HOLTZMAN, EQUELS & FURIA |
| A Professional Association | 16 West Pine Street |
| Signature Plaza, Suite 300 | Orlando, FL 32801 |
| Post Office Box 1873 | (407) 839-0095 Telephone |
| Orlando, Florida 32802-1873 | (407) 839-2050 Facsimile |
| (407) 872-7300 Telephone | (Hand-Delivered) |
| (407) 841-2133 Facsimile | |
| (Hand-Delivered) | *Of Counsel:* |
| | BRIAN A. SUN, ESQUIRE |
| *Of Counsel:* | YOLANDA OROZCO, ESQUIRE |
| JAMES T. PHALEN, ESQUIRE | O'NEILL, LYSAGHT & SUN LLP |
| KING & SPALDING | 100 Wilshire Boulevard, Suite 700 |
| 1730 Pennsylvania Avenue, N.W. | Santa Monica, CA 90401 |
| Washington, D.C. 20006-4706 | (310) 451-5700 Telephone |
| (202) 737-0500 Telephone | (310) 399-7201 Facsimile |
| (202) 626-3737 Facsimile | (U.S. Mail, Postage Paid) |
| (U.S. Mail, Postage Paid) | |

Counsel for Defendant KPMG LLP

Counsel for Defendants
QA Investments LLC

Frank A. Hamner

QUADRA ADVISORS, L.L.C

September 8, 1997

PERSONAL AND CONFIDENTIAL

Joe Jacoboni
C/o Phil Blake
4060 S. Water
Orlando, FL 32804

Dear Joe:

Pursuant to discussions with your professional advisers, it was noted that you wish to implement a direct and indirect leveraged stock purchase investment strategy utilizing QA Investments, LLC as the investment advisor. To initiate the process, I have included the following documents for your review:

- Investment advisory agreement between you and QA Investments, LLC (Quadra). This document will govern the trading account Quadra will set-up with UBS Securities, LLC on your behalf.
- Part II of QA's Form ADV that was utilized to apply for registration with the Securities and Exchange Commission. Please note that QA has not yet received notification of effective registration.
- Form W-9.
- Wire instructions for UBS Securities, LLC and BankAmerica Trust and Banking Corporation, Ltd. which will be utilized to transfer proceeds for any direct stock purchases or warrant purchases respectively.

After executing the advisory agreement and W-9 please return them to us in the enclosed envelope. This will enable us to set up your UBS account. Funding of this account in the total proposed amount of $1,700,000 can be effected through the Union Bank of Switzerland, New York Branch wire instructions.

Soon after you should receive a warrant from the offshore administrator, BankAmerica Trust and Banking Corporation, Ltd. This warrant will be used to purchase an equity option interest in Jacaranda Capital, Inc., a newly incorporated Cayman Island special purpose investment vehicle. This warrant should be executed and returned along with a wire transfer for the warrant purchase price of $2,380,000 to BankAmerica.

Please contact Norm Bontje or me with any questions.

Regards,

Dan McNamara

## QA INVESTMENTS, LLC
## INVESTMENT ADVISORY AGREEMENT

This Investment Advisory Agreement is entered into on this _10_ day of _Sept_, 199_7_, by and between Joe Jacoboni (the "Client"), and QA Investments, LLC, a Delaware limited liability company (the "Investment Adviser").

WHEREAS, the Client wishes to purchase certain securities and may wish to utilize various hedging strategies to minimize differing risks related to these securities as described in the attached Exhibit A; and

WHEREAS, the Client wishes to appoint the Investment Adviser to facilitate the purchase and hedging transactions described above in its account at UBS Securities, LLC;

NOW, THEREFORE, the parties hereby represent and agree as follows:

1.     <u>Appointment of Investment Adviser.</u> The Client hereby appoints the Investment Adviser as investment manager with respect to such portion of the funds of the Client as may be designated by the Client from time to time (the "Account"). At no time shall the Investment Adviser have actual possession of any property in the Account.

2.     <u>Discretionary Authority.</u> The Investment Adviser shall have full power and discretion in the investment and reinvestment of assets of the Account, without prior consultation or approval, subject to the investment objectives as set forth in Exhibit A. This authority shall include the power to: (a) buy, sell, exchange, convert, and otherwise trade in any and all publicly and privately traded stocks, bonds, derivative instruments, and other securities as the Investment Adviser may deem advisable and in the best interests of the Client in light of such investment objectives; and (b) place orders for the execution of such securities transactions through such brokers or dealers as the Investment Adviser may select. In selecting a broker or dealer the Investment Adviser will comply with its fiduciary duty to obtain the best net price and the best execution and with the provisions of Section 28(e) of the Securities Exchange Act of 1934, which will take into account such relevant factors as (a) price, (b) the broker's or dealer's facilities, reliability and financial responsibility, (c) the ability of the broker dealer to effect securities transactions, particularly with regard to such aspects as timing, order size, and execution of orders, and (d) the research and brokerage services provided by such broker or dealer to the Adviser, notwithstanding that the Account may not be the direct or exclusive beneficiary of such services.

The Client represents to the Investment Adviser that the Client has retained the services of _KPMG Pete Marwick_. ("_KPMG_") and that the Client, based upon the advice of _Phil Blake_, has determined that the investments and strategies described in Exhibit A are suitable for the Client. The Client acknowledges that the Investment Adviser shall be entitled to rely and act upon instructions from representatives of _Phil Blake_ as if such instructions were made by the Client.

---

3.     Procedures with Respect to Securities.  All transactions, purchases and sales of securities by the Investment Adviser with respect to the Account shall be consummated by payment to or delivery of the cash or securities or other property due to or from the Client.  Instructions which materially change the investment objectives set forth in Exhibit A shall be made to the Investment Adviser in writing (including facsimile transmission) or orally and confirmed in writing (including facsimile transmission) as soon as practicable thereafter.  The Investment Adviser shall instruct all brokers executing orders with respect to the Account to forward to the Client copies of brokerage confirmations promptly after execution of all such transactions.

4.     Fees.  The compensation of the Investment Adviser for its services rendered hereunder shall be calculated and paid in accordance with Exhibit B.

All expenses of any sort or kind related to the Account including, but not limited to, any costs of safekeeping, transport, acquisition and disposition, such as brokerage and other execution costs, custody fees and margin costs, shall be paid by the Client.

5.     Dividends and Account Reports.  Dividends and other income or distributions on or with respect to any of the assets of the Account shall be credited to the Account and reinvested by the Investment Adviser in accordance with this Agreement.  As confirmations of transactions in the account will be sent directly from the brokers executing orders, the Investment Adviser shall not provide any report of the account.

6.     Services to Other Clients.  The Client understands and agrees that the Investment Adviser and its affiliates perform investment advisory and investment management services for various clients other than the Client.  The Client agrees that the Investment Adviser and its respective affiliates may give advice and take action in the performance of its duties with respect to any of its other clients which may differ or be the same as advice given, or the timing or nature of action taken, with respect to the Account.  Nothing in this Agreement shall be deemed to impose upon the Investment Adviser any obligation to purchase or sell or to recommend for purchase or sale for the Account any security or other property which the Investment Adviser or its respective affiliates may purchase or sell for its own account or for the account of any other client, if in its sole discretion the Investment Adviser, for any reason, considers it undesirable or impractical to take such action or make such recommendation for the Account. THE CLIENT HEREBY ACKNOWLEDGES THAT THE INVESTMENT ADVISER CONTEMPLATES TAKING INVESTMENT POSITIONS OPPOSITE IN NATURE TO THAT OF THE CLIENT.

7.     Liability.  Neither the Investment Adviser nor any of its officers, directors, employees, or agents shall be liable for any actions performed or omitted, or for any loss, resulting from the exercise of its professional judgment in carrying out its obligation under this Agreement provided that the Investment Adviser shall remain responsible for its gross negligence, willful malfeasance, or violation of applicable law.

The Client shall indemnify the Investment Adviser and its partners, affiliates, employees, and agents (each an "Indemnified Person") against any and all losses, claims, damages or liabilities, joint or several, including, without limitation, reasonable attorney's fees and disbursements, resulting in any way from the performance or non-performance of the Investment Adviser's duties hereunder, except those resulting from gross negligence, willful malfeasance or violation of applicable law in the performance of the Investment Adviser's obligations and duties, and, in the case of criminal proceedings, unless such Indemnified Person had reasonable cause to believe its actions unlawful.

8.  Voting.  The Investment Adviser shall have the power to vote, either in person or by proxy, tender and take all actions incident to the ownership of all securities in which assets of the Account may be invested from time to time.

9.  Termination.  This Agreement may be terminated by either the Client or the Investment Adviser by giving the other party written notice of at least 90 days.

10.  Representations by the Client and the Investment Adviser.  The Client and Investment Adviser each represents that the terms hereof do not violate any obligation by which it is bound, whether arising by contract, operation of law, or otherwise. The Client and Investment Adviser each represents that it is duly organized, validly existing and in good standing under the laws of its State of organization and has full power and authority to execute and deliver this Agreement and carry out its obligations hereunder, the execution and delivery of the Agreement has been duly authorized by all necessary action on its behalf; the execution, delivery and performance of this Agreement does not violate any agreement or arrangement to which it is a party or by which it is bound, or any order or decree to which it is subject; and this Agreement constitutes the valid and binding agreement.

11.  Confidential Relationship.  The parties agree that all information and advice provided by either party to the other or the Client shall be treated as confidential and shall not be disclosed to third parties except as required by law or as necessary in connection with regular portfolio transactions for the Account.

12.  Amendment and Assignment.  This Agreement may not be amended without the prior written consent of both parties, and may not be assigned by either party without the prior written consent of the other.

13.  Waivers.  A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach of such provision or of any other provision hereof. Failure of either party to enforce at any time or from time to time any provision of this Agreement shall not be construed as a waiver thereof.

14.  Attorneys' Fees.  The prevailing party in any action brought by either party hereto to enforce its rights under this Agreement shall be entitled to recover all costs and expenses (including reasonable attorneys' fees) incurred in prosecuting or defending such action.

15.   Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of law) to the extent not preempted by applicable Federal law.

16.   Compliance.  The Client and Investment Adviser shall comply in all material respects with all material laws, regulations and rules applicable to it in its performance of its duties and obligations under this Agreement including, without limitation, (i) the federal securities laws and all regulations and interpretations of the Securities and Exchange Commission, (ii) the U.S. Commodity Exchange Act, and all regulations and interpretations of the Commodity Futures Trading Commission and the National Futures Association, (iii) all applicable rules of any relevant U.S. and non-U.S. commodity exchanges, (iv) any applicable money laundering laws or regulations, and (v) all applicable tax laws and regulations.

17.   Aggregation.  The Client understands that the Investment Adviser may open "average price" accounts in which purchase and sale orders placed during a trading day on behalf of the Account and other clients or affiliates of the Investment Adviser and its affiliates are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

The parties hereto have hereunto caused this Agreement to be duly executed the day and year first hereinbefore written.

Investment Adviser
QA Investments, LLC

By: _____

Title: _____
Address:   999 Third Avenue Suite 4150
           Seattle, WA 98104


Client
Joe Jacoboni

By: _____

Title: _____
Address:   P.O. Box 952488
           Lake Mary, FL 32746

FL0115
225 Water Street
9th Floor
Jacksonville, Florida 32202
904 361-3451
Fax 904 361-3744

Vice President
Senior Financial Advisor
Personal Financial Consulting



Mr. Chris Hirata
QA Investments, LLC
999 Third Avenue, Suite #4150
Seattle, WA 98104
via Facsimile (206) 442-9291

Mr. Ian Dungate
Bank America Trust and Banking
Corporation (Cayman) Ltd.
P.O. Box 1092; Front Street
Grand Cayman, British West Indies
Via Facsimile (345) 949-7883

Mr. Paul Lumsden
Maples & Calder
P.O. Box 309
Ugland House - South Church Street
Grand Cayman, British West Indies
Via Facsimile (345) 949-8080

Gentlemen:

At the request of QA Investments, LLC we are providing you with a brief overview
of our client's proposed warrant purchase in the newly formed corporation
Jacaranda Capital, Inc. (the "Company").

Upon incorporation of the Company, our client, Joseph Jacoboni, will purchase a
warrant which, if exercised, would give him 85 percent of the outstanding shares in
the Company. We anticipate that the primary assets of the Company will be the
proceeds from the sale of the warrants, and that these assets will then be invested in
listed European equities. Furthermore, market risk from these investments will be
hedged through the use of a variety of derivative transactions. All investment
activities will be managed by QA Investments, LLC, an affiliate of Quadra Capital
Management, LP.

Mr. Jacoboni, has been a client of First Union National Bank for several years. Mr. Jacoboni accumulated his wealth primarily from the development and ultimate sale of a software support company.

We trust that this information will supply you with the information you need to provide administration services to the Company. Please feel free to contact me if you require any additional information.

Very Truly Yours,

Lisa G. Rudolph, CPA, CFP

First Union National Bank

cc:     Joe Jacoboni
        Marc Johnson, First Union National Bank

 **Peat Marwick** LLP

Suite 2800
Two First Union Center
Charlotte, NC 20202-0290

Telephone 704 335 5300

Telefax 704 335 5377

September 15, 1997

<u>Private and Confidential</u>

Mr. Joe Jacoboni
P.O. Box 952488
Lake Mary, FL 32746

Dear Mr. Jacoboni:

The purpose of this letter is to define the role of KPMG Peat Marwick LLP ("KPMG") in your proposed participation in an investment strategy (the "Strategy"), and to confirm our understanding of the terms of our engagement to assist you and QA Investments LLC, ("QA") as a tax advisor in connection with your participation in the Strategy. The background for your participation in the Strategy and the role of KPMG are as follows:

<u>Background</u>

1. KPMG understands that you intend to engage QA, a registered investment advisor, to provide you with investment advisory services and trading strategies designed to permit you to acquire both directly, and indirectly, a position in the shares of a Foreign Bank.

2. KPMG understands that QA will facilitate the purchase of shares and options in Foreign Bank. The purchase of Foreign Bank shares and options will involve full economic risk to you in the stock market movement (up or down) of Foreign Bank securities. You may realize either profits or losses based upon the movement of the Foreign Bank shares. No one has provided you with any assurances or guarantees that you will make money in any of these transactions. You are at all times subject to market risks for both reward and loss.

3. You intend to purchase a warrant to acquire a controlling interest in an offshore investment company in connection with the Strategy. You acknowledge and agree that this offshore investment company will pay fees on your behalf, to KPMG in consideration of tax consultation services in connection with the Strategy.





## KPMG's Role as Tax Advisor

KPMG has agreed to provide you with a tax opinion concerning the tax consequences of the various transactions that are expected to be undertaken with respect to the Strategy. You acknowledge that the tax opinion issued by KPMG does not guarantee tax results, but rather provides that the tax treatment described in the opinion is more likely than not to occur.

KPMG's tax opinion is to be used solely by you for the purpose of evaluating the federal tax consequences of the Strategy and is not to be used or relied upon by any other party or distributed to any other party. KPMG will be paid for the tax opinion, and services related to the transaction, on your behalf, by the offshore investment company.

## Liability

By approving this arrangement, you agree to indemnify KPMG and its affiliates, partners, principals, directors, officers, employees, agents and controlling persons (collectively, the " Indemnified Parties") from and against all losses, claims, damages, and liabilities, including reasonable attorney's fees and other expenses or costs of litigation (collectively, "Damages"), to which the Indemnified Parties may become subject under any applicable federal or state law or other statutes, common law, or otherwise, and arising, directly or indirectly, from this engagement as the result of any assertion by you. The Indemnified Parties shall not be indemnified to the extent such Damages directly and immediately result from KPMG's bad faith or gross negligence. In the event any Indemnified Party is requested pursuant to subpoena or other legal process to produce documents relating to this engagement in judicial or administrative proceedings to which such Indemnified Party is not a party, you shall reimburse the Indemnified Party at standard billing rates for the Indemnified Party's professional time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

KPMG's aggregate maximum liability to you arising for any reason relating to KPMG's performance of services hereunder, except in the case of KPMG's bad faith or negligence, shall be limited to ten thousand dollars.

KPMG shall have no liability to you for any special, incidental or consequential damages, including without limitation loss of profits, even if KPMG has been advised of the possibility of such damages.

You will not directly or indirectly refer to KPMG or any of its affiliates in any printed, audiovisual, on-line or other advertising or promotional material prepared or distributed by or for you without KPMG's specific advance review and prior written approval. The provisions of this paragraph shall survive the expiration of this Agreement.

In the event that any term or provision of this Agreement shall be held to be invalid, void, or enforceable, then the remainder of this Agreement shall not be effected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Please indicate your agreement to the above terms and understandings by signing the enclosed copy of this agreement and returning it to us.

Very truly yours,

KPMG Peat Marwick LLP

Carolyn B. Branan
Partner

CBB:mkw

Enclosure

**ACCEPTED:**

_____
Mr. Joe Jacoboni

_7/30/98_____
Date

**JOSEPH J. JACOBONI**
**POST OFFICE BOX 952488**
**LAKE MARY, FLORIDA 32746**


July 29, 1998


Ms. Carolyn Branan
KPMG Peat Marwick
2800 Two First Union Center
Charlotte, NC 28282

RE: REPRESENTATION LETTER

Dear Ms. Branan:

Pursuant to Peat Marwick's instruction that I sign the "representation letter," and based on the statements regarding the purpose of the letter made by you and Craig Richie, I enclosed herein an executed copy of the letter.

I understand that you will forward a copy of the letter to Dale Bowman so that peat Marwick will finalize and release the tax opinion letter and complete my tax return.

Sincerely,

Joseph J. Jacoboni

JJJ/cat

Enclosure

May 15, 1998

Ms. Carolyn Branan, Partner
KPMG Peat Marwick
2800 Two First Union Center
Charlotte, NC 28282

RE: Leveraged Investment in the stock of United Bank of Switzerland

Dear Carolyn:

At my request, KPMG Peat Marwick LLP ("KPMG") will render a tax opinion as to certain of the federal income tax consequences resulting from certain transactions (hereafter, "the transaction") involving a direct and indirect investment in the stock of United Bank of Switzerland ("Foreign Bank") by Joseph Jacoboni ("Investor") in part by acquiring a warrant to purchase stock in a foreign investment company, Jacaranda Capital, Inc. ("Foreign Corporation"), whose investment advisor is Quadra Capital Management, L.P. ("Investment Advisor"), and whose sole shareholder is a nonresident alien individual ("Foreign Person").

In connection with this opinion, and recognizing that you will rely on this letter in rendering said opinion, I hereby represent that the factual description of the transactions attached as Exhibit A to this letter is accurate and true to the best of my knowledge. To the best of my knowledge, I have provided KPMG with all facts and circumstances that I know or have reason to know are pertinent to this opinion letter, and that such facts and circumstances are fully disclosed in Exhibit A.

To the best of my knowledge, the assumptions attached as Exhibit B to this letter, and upon which your opinion will rely, are accurate and reasonable.

In addition, in connection with the tax opinion, and recognizing that you will rely on this letter in rendering said opinion, I hereby certify and represent that, to the best of my knowledge:

a)  Neither Investor, Foreign Person, Investment Advisor, nor Foreign Corporation had any power to cause the redemption described above to occur.

b)  Although all of the transactions have been accomplished as discussed above, there was no legally binding agreement, written or otherwise, that compelled any of the parties to complete these transactions in the way described herein, or indeed at all.[1]

c)  Based upon the analysis provided by Q.A. Investments, LLC, the investment advisor to Foreign Corporation and Investor, Foreign Corporation and Investor

---

[1] Foreign Bank and Jacaranda Capital, Inc. have also represented that although all of the transactions have been accomplished as discussed above, there was no legally binding agreement, written or otherwise, that compelled any of the parties to complete these transactions in the way described herein, or indeed at all.

each reasonably believed it had an opportunity to earn a reasonable profit from the transactions described herein, in excess of all associated fees and costs and without regard to any tax benefits that might arise.

d) Prior to entering into the investment transactions described herein, Investor owned no other shares of Foreign Bank stock.[2]

e) Based upon its review of the analysis provided by Q.A. Investments, LLC, publicly available financial information and to the best of Investor's knowledge, Foreign Bank is highly profitable on a worldwide basis.[3]

f) Foreign Corporation, Investor, Foreign Person, Investment Advisor, and Foreign Bank each acted independently and at arms length with respect to the above transactions.

g) There were no written agency agreements consummated with respect to the above transactions, and none of the parties involved held itself out to a third party as an agent of any of the others with respect to these transactions.

h) Investor will not make the election under section 1296 to have Foreign Corporation treated as a qualified electing fund.

i) Investor has not received any distributions from Foreign Corporation.

j) Investor does not have the right to exercise the rights of a shareholder of Foreign Corporation nor to control, directly or indirectly, the actions of Foreign Corporation.

k) Investor has provided us with all facts and circumstances that it knows or has reason to know are pertinent to this opinion letter and that all assumptions or representations on which this opinion relies are reasonable.

To the best of my knowledge and belief, the above representations are reasonable.

This letter is being furnished to you solely for your benefit and for use in rendering your opinion and is not to be used, circulated, quoted or otherwise referred to for any other purpose (other than inclusion in your opinions) without my express written consent. The foregoing certification is true to the best of my knowledge.

Very truly yours,

Joseph Jacoboni

---

[2] Jacaranda Capital, Inc. and Foreign Person have also represented that prior to Jacaranda Capital, Inc.'s purchase of its Foreign Bank shares, neither owned Foreign Bank shares, directly or indirectly.

[3] Jacaranda Capital, Inc. has also represented that based upon its review of publicly available financial information and to the best of its knowledge, Foreign Bank is highly profitable on a worldwide basis.

**Factual Description of the Transactions**

1. **Initial Investment Structure.**

Foreign Corporation is a corporation organized under the laws of the Cayman Islands. Foreign Corporation is wholly owned by a non-United States citizen and non-United States resident ("Foreign Person"), unrelated to Investor. On September 30, 1997, Investor purchased a warrant from Foreign Corporation to acquire 85 percent of the shares of Foreign Corporation. The cost of the warrant was $2,450,000. Under the terms of the warrant, Investor could either exercise the warrant to purchase 4,250 Foreign Corporation shares or, alternatively, the warrant could be cash settled based upon the warrant's "put value". The "put value" was equal to the net asset value of Foreign Corporation multiplied by the percentage of Foreign Corporation stock covered by the warrant (i.e., the put value was equal to 85 percent of Foreign Corporation's net asset value). Net asset value was defined as the fair market value of net assets less liabilities less existing shareholder equity. Sixty day notification was required for exercise of the warrant or cash settlement. The warrant's expiration date was September 30, 1998.

On September 26, 1997, Investor also directly purchased 1,497 shares of Foreign Bank from Foreign Bank at a price of $1,168.45 per share (approximately $1,749,178).

At the time of the investment strategy's commencement, Foreign Corporation had commitments in place from Foreign Bank to finance 100 percent of its intended share purchase. The financing was provided at market interest rates. Utilizing this credit facility, Foreign Corporation purchased 29,610 shares of Foreign Bank at a price of CHF 1,720 per share (approximately $35,184,000) on September 30, 1997. Neither Foreign Corporation nor Foreign Person owned any other Foreign Bank shares during the time that Foreign Corporation held these shares.

In order to protect Foreign Corporation's leveraged investment position from a significant drop in the price of Foreign Bank, Investment Advisor advised Foreign Corporation to enter into certain hedging transactions. On September 30, 1997, Foreign Corporation sold European-style call options to Foreign Bank with a CHF 1,634 strike price and a November 19, 1997 expiration date on 100 percent of its Foreign Bank share position. Embedded within the call options was a daily digital option feature described as the "RECAP" option (see Investment Advisors description and the Foreign Bank option confirmation). With the daily digital option feature, Foreign Corporation earned a fixed daily payment for each day that the price of Foreign Bank closed above a pre-defined level. These benchmark levels were designed to correspond to the projected gradual appreciation that was expected in the underlying Foreign Bank stock.

The call options were 5 percent in the money and were written at a strike price which could have qualified the call options as "qualified covered calls" within the meaning of Code Section 1092(c),[4] had such calls been written on an "established securities market." The strike price of the call options was adjustable downward by 5 percent if the Foreign Bank share price closed below CHF 1,634 prior to the option's expiration. To further protect its position, Foreign Corporation also purchased European-style put options from Foreign Bank with a strike price of CHF 1,548 per share and a November 19, 1997 expiration date on 100 percent of its Foreign Bank shares. This price was significantly out of the money as that term is defined by Regulation Section 1.246-5(c)(2).

2.    **Investor Ownership Structure**

Investor, an individual, is a United States citizen and resident.

3.    **Subsequent Events**

On November 19, 1997, when Foreign Bank shares were trading at CHF 1,676, Foreign Bank exercised its call options and purchased Foreign Corporation's 29,610 Foreign Bank shares for the CHF 1,634 per share option strike price. There was no agreement between Foreign Corporation and Foreign Bank that compelled Foreign Bank to redeem such shares.

Simultaneous with the November 19, 1997 redemption, Investor directly purchased 29,610 over the counter call options from Foreign Bank in order to maintain his overall portfolio position in Foreign Bank. The number of the options purchased was equal to the number of shares Foreign Bank redeemed.

On November 27, 1997, Investor sold back to Foreign Bank, the Foreign Bank call options, yielding proceeds of CHF 858,690 and a profit of approximately $193,189.

On December 28, 1997, Investor elected to put his warrant back to Foreign Corporation for its zero value. As noted above, the price paid for this warrant on September 30, 1997 was $2,450,000. Investor sold 1,134 shares of Foreign Bank stock for $1,649,766 on December 30, 1997, yielding a profit of approximately $324,738. As of the date of this letter, Investor continues to hold his remaining 363 share portfolio investment in Foreign Bank.

---

[4]    All section references are to the Internal Revenue Code of 1986, as amended. Citations of final, temporary, and proposed treasury regulations promulgated under the Code are indicated by the references Regulation Section, Temporary Regulation Section, and Proposed Regulation Section, respectively.

## EXHIBIT B

### Assumptions

In connection with the above transactions, Investor has relied upon Quadra Advisors, LLC, Quadra Capital Management, L.P., and BankAmerica Trust & Banking Corporation (Cayman) Ltd. to appropriately execute the activities of Foreign Corporation such that the following could be relied upon:

a) That for purposes of characterizing the distribution received by Foreign Corporation in connection with the complete redemption of its stock ownership in Foreign Bank, Foreign Bank will have sufficient earnings and profits within the meaning of section 316 to cause the distribution, if subject to section 301, to be treated as a dividend for United States Federal income tax purpose..

b) That Foreign Corporation is not and has never been engaged in a United States trade or business.

c) That during all periods relevant hereto, Foreign Person has not been engaged in a United States trade or business.

d) That Foreign Corporation is characterized as a corporation for United States Federal income tax purposes, and has complied with all corporate registration requirements and other formalities such as directors' meetings and the taking of corporate minutes as required under the laws of the Cayman Islands.



401 South Tryon Street
Suite 2300
Charlotte, NC 28202-1911

January 29, 2002

Dean R. Orr, CPA, CVA
Parks, Tschopp, Whitcomb & Orr
2600 Maitland Center Parkway
Suite 330
Maitland, FL 32751

Re: Access to KPMG Tax Files and Work papers

Dear Mr. Orr:

We have previously prepared the 1998, 1999 and 2000 federal income tax returns of Joseph Jacoboni. In connection with the IRS examination of prior year individual income tax returns, Mr. Jacoboni has requested that we allow Parks, Tschopp, Whitcomb & Orr access to our work papers prepared in connection with the tax returns and accounting reports referred to above. For that purpose only, we will provide you access to our work papers that relate to your objective. Work papers that we consider proprietary will not be made available.

The work papers were prepared to support the tax filings. The work papers were not intended for the benefit of Parks, Tschopp, Whitcomb & Orr or any other third party, and are not intended to be taken to replace any other inquiries and procedures that Parks, Tschopp, Whitcomb & Orr should undertake for the purpose of your engagement. They will not address all the questions that a prospective investor/lender may have. We make no representations as to the sufficiency, accuracy, completeness, or appropriateness of the information in our work papers for your purpose.

In preparing the tax returns, we relied upon information and representations provided by Mr. Jacoboni and his representatives. Our engagement could not be relied upon to uncover errors in the underlying information incorporated into the returns, or other irregularities should any exist. Mr. Jacoboni and his partners have ultimate responsibility for the income tax returns.

Because your review of our work papers is undertaken solely for the purpose described above, and will not entail a review of all KPMG work papers, you agree that (1) the information obtained from the review will not be used by you for any other purpose, (2) you will not provide expert testimony, litigation support services, or otherwise accept an engagement to comment on issues relating to the quality of our tax return preparation.

We may, at our discretion, provide you with copies of work papers you may request. You agree to subject any such copies or information otherwise derived from our work papers to your normal policies for the retention of work papers and protection of confidential client information. You agree to advise us promptly and provide us a copy of any subpoena, summons, request for production, or other court order or process for access to your work papers that include copies of our work papers or information otherwise derived therefrom.

In consideration of KPMG allowing Parks, Tschopp, Whitcomb & Orr access to the work papers referred to above, and to the information contained therein, Parks, Tschopp, Whitcomb & Orr agrees that it does not acquire any right as a result of such access that it would not otherwise have had. Parks, Tschopp,



Mr. Dean R. Orr
Parks, Tschopp, Whitcomb & Orr
January 29, 2002
Page 2

Whitcomb & Orr also agrees that KPMG has not assumed any duties or obligations as a result of permitting access that it would not otherwise have had.

Parks, Tschopp, Whitcomb & Orr also agrees to indemnify and hold harmless KPMG, and its personnel, from any claim by any other third party which arises as a result of KPMG permitting access to its work papers in connection with this engagement.

Please confirm your agreement with the foregoing by signing and dating the enclosed copy of this letter and returning it to us.

Very truly yours,

KPMG LLP

James M. McMahon
Senior Manager

cc: Carolyn Branan – KPMG
    Joseph DePew – KPMG
    Mr. Jacobson

Agreed and accepted:

Parks, Tschopp, Whitcomb & Orr

By _____          Date _____
    Name and Title