FILED

2004 MAR 11 PM 2: 24

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JOSEPH J. JACOBONI,**

          **Plaintiff,**

-vs-                                    **Case No.  6:02-cv-510-Orl-22DAB**

**KPMG LLP,**

          **Defendant.**

# O R D E R

## I. INTRODUCTION

This cause comes before the Court for consideration of a Report and Recommendation ("R&R") (Doc. 181) issued by the assigned Magistrate Judge on February 5, 2004. In the R&R, the Magistrate Judge recommended that Defendant KPMG LLP's Motion for Judgment on the Pleadings (Doc. 143) be granted in part and denied in part.[1] More particularly, the Magistrate determined that some, but not all, of the predicate acts underlying Plaintiff Joseph J. Jacoboni's federal racketeering ("RICO") claim are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"),[2] 18 U.S.C. § 1964(c).  Accordingly, the Magistrate

---

[1] The R&R also contained recommendations concerning two other motions: KPMG's Motion for Summary Judgment (Doc. 155) and KPMG's Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159).  Given the Court's disposition of the R&R regarding KPMG's Motion for Judgment on the Pleadings, it is unnecessary to address the recommendations concerning the other two motions.  In any event, no party has objected to the Magistrate Judge's recommended disposition of KPMG's Motion to Exclude.

[2] Pub. L. 104-67, 109 Stat. 737 (1995).

236

Judge recommended that the motion be denied to the extent it seeks judgment on the pleadings, but granted insofar as it seeks to prohibit Jacoboni from relying on certain conduct to establish a RICO violation.

KPMG objects to the R&R, asserting that the PSLRA precludes the entirety of Jacoboni's RICO claim. *See* Doc. 184.[3] Accordingly, KPMG urges the Court to grant judgment in its favor on that claim. Additionally, KPMG asks the Court to decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), over Jacoboni's remaining claims, which all arise under Florida law. In response, Jacoboni argues that the Magistrate Judge's recommendations should be adopted. *See* Doc. 233. Jacoboni further asserts that even if the Court should grant KPMG a judgment on the RICO claim, it should retain jurisdiction over the state law claims.

Upon considering the R&R and the parties' submissions relating thereto, the Court determines that the PSLRA bars Jacoboni's entire RICO claim. Accordingly, KPMG is entitled to judgment on that claim. Additionally, in its discretion pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Jacoboni's state law claims; those claims will be dismissed, with leave to refile them in state court.

---

[3]KPMG also objects to the Magistrate Judge's recommendation that KPMG's summary judgment motion be denied. However, as previously stated, the Court need not address that recommended disposition.

## II. BACKGROUND[4]

As set forth in the operative Second Amended Complaint (Doc. No. 84),[5] as a result of a sale of stock, Jacoboni faced approximately $28 million in federal income tax capital gains liability in 1997. After being referred to KPMG by his banker, Jacoboni decided to enter into an investment strategy (referred to as "FLIP") proposed by KPMG. According to the allegations, KPMG represented the strategy as a "no lose" proposition in that he would either make money or any losses incurred would offset the 1997 capital gains for federal income tax purposes. KPMG represented that Jacoboni would have to engage the financial and tax advisory services of QA and QA would certify the "economic substance" of the tax strategy. Allegedly, independent review of the strategy by other professionals was prohibited by KPMG, as the strategy was "confidential."

The strategy involved Jacoboni purchasing shares of a Swiss bank for approximately $1.74 million and a warrant from a Cayman Islands company for $2.45 million. The shares were then sold, purchased and resold in a series of transactions "designed to effect a 'basis shift'" which would enable Jacoboni to claim a capital loss on his sale of the Swiss bank stock.

---

[4]The following background statement is taken nearly verbatim from the "Background" section of the R&R; neither side has objected to the Magistrate Judge's recitation of the facts. "Plaintiff" as used in the R&R has been changed herein to "Jacoboni." Footnotes appearing in the "Background" section of the R&R are included herein, although the footnote numbers have been changed to conform sequentially to the footnotes in this Order.

[5]Jacoboni's initial pleadings, which included claims against Quadra Capital Management, L.P., d/b/a QA Investments (herein "QA"), were dismissed by the Court, and Jacoboni was given leave to amend and proceed solely against Defendant KPMG (Doc. Nos. 57 and 83). These allegations are effectively supplemented by Jacoboni's RICO statement (Doc. No. 29), filed in response to a directive from the Court.

(*See* Doc. No. 84 at 5-6). The transactions were at the direction of and executed by KPMG and QA, according to Jacoboni. Jacoboni asserts that he was not apprised of the significant tax risks associated with this strategy, and KPMG represented that it was "bullet proof." *Id.* at 6. KPMG and QA were paid "substantial fees" for their services. *Id.* at 9.

KPMG sent Jacoboni an engagement letter dated September 15, 1997, which Jacoboni eventually signed. KPMG also sent a Representation Letter, which allegedly contained representations Jacoboni did not know to be true. KPMG insisted that Jacoboni sign the letter and return it, as a prerequisite to Jacoboni's receiving KPMG's promised tax opinion and completing his 1997 tax return. Jacoboni and his attorney had discussions with KPMG, wherein certain representations were allegedly made by KPMG, including that the Representation Letter was not prepared to insulate KPMG from liability if there was a problem or penalty as a result of a future IRS audit and that KPMG would still be ". . . on the hook." *Id.* at 12. According to Jacoboni, he relied on these assurances and eventually signed the Representation Letter.

KPMG did not deliver its promised tax opinion regarding the 1997 investments to Jacoboni, but Jacoboni did receive a "concurring opinion" from a law firm. KPMG prepared Jacoboni's 1997 federal income tax return, which reflected over $30 million in capital losses from the tax strategy.

In July 2001, the Internal Revenue Service issued a notice regarding "Basis Shifting Tax Shelters," indicating that certain transactions involving foreign corporations could be subject to disallowance for tax purposes, interest on unpaid taxes, and possible penalties against taxpayers and others. Allegedly, KPMG knew that the IRS was investigating and challenging

-4-

similar offshore investments "at least 2 ½ years earlier" but did not inform Jacoboni. *Id.* at 14. The IRS subsequently initiated an audit of Jacoboni's 1997 tax return and at the time of the filing of the Second Amended Complaint, the audit was not resolved.[6]

Jacoboni sues KPMG under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) (Count I), and asserts numerous state law claims: breach of contract (Count II); accountant malpractice (Count III); fraud (Count IV); negligent misrepresentation (Count V); promissory estoppel (Count VI); and violation of Florida's Deceptive and Unfair Trade Practices Act (Count VII). KPMG denies any wrongdoing and has counterclaimed in various counts for unpaid fees, fraud and contractual indemnification (Doc. Nos. 93 and 103).

## III. ANALYSIS

### A. RICO Claim

As amended by the PSLRA, the RICO statute provides:

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.* The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final. (emphasis added)

---

[6]According to latter filings, Jacoboni has since settled with the IRS, resulting in the disallowance in large part of the capital loss claimed and a substantial tax liability.

18 U.S.C.A. § 1964(c).

As previously noted, the Magistrate Judge determined that the emphasized language barred some, but not all, aspects of Jacoboni's RICO claim. The Magistrate recognized that "courts that have addressed this issue have concluded that this section has broad application to preclude plaintiffs from asserting RICO claims based on predicate acts that could have given rise to claims of securities fraud." R&R at 5 (citing *Florida Evergreen Foliage v. E. I. DuPont De Nemours and Co.,* 165 F. Supp. 2d 1345, 1356 (S. D. Fla. 2001), *aff'd, Green Leaf Nursery v. DuPont*, 341 F.3d 1292 (11th Cir. 2003); *Bald Eagle Area School Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 330 (3rd Cir.1999); and *Howard v. America Online Inc.*, 208 F.3d 741, 749-50 (9th Cir.), *cert. denied,* 531 U.S. 828 (2000)). He also noted KPMG's reliance on "a Southern District of Florida case asserting similar claims against KPMG, based on the same (or a similar) tax strategy complained of in this case." R&R at 6. He characterized that case, *Loftin v. KPMG LLP*, 2003 WL 22225621 (S. D. Fla. 2003), as one in which the district judge "found that the alleged predicate acts of mail and wire fraud relating to KPMG's FLIP strategy 'would be actionable under 15 U.S.C. § 78(j)(b) and SEC Rule 10b-5,' and therefore the PSLRA bar applied to warrant dismissal of Loftin's RICO claim with prejudice." R&R at 6. Nevertheless, the Magistrate Judge declined to follow those authorities, stating that he did not consider the PSLRA "to be an absolute bar to any RICO action involving securities." *Id.* at 6.

After analyzing the language of § 1964(c) and acknowledging the securities laws have been "construed . . . broadly to encompass a wide range of conduct actionable as fraud," R&R at 8, the Magistrate Judge reviewed Jacoboni's pleadings "to determine whether the conduct

pled is actionable as securities fraud and, if so, whether adequate non-securities fraud conduct

is pled to support a RICO claim," *id.*  In that regard, the Magistrate stated:

> In his RICO Case Statement (Doc. No. 29, 4-8), Plaintiff lists and describes in detail the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) he asserts constitute the pattern of racketeering activity.  Specifically, Plaintiff states as follows:
>
> 1)   Mail Fraud - KPMG and QA Investments mailed Jacoboni a three-page engagement letter on September 15, 1997 for his signature.  The letter was an attempt to insulate KPMG from any liability.  At the advice of his attorney, Jacoboni did not sign the letter in 1997 because it was confusing and misleading. . . .
>
> 2)   Mail Fraud - In May 1998, KPMG and QA prepared a letter for Mr. Jacoboni's signature regarding "Leveraged Investment in the stock of United (sic) Bank of Switzerland," which incorrectly suggested that Jacoboni had detailed knowledge of all the transactions comprising the KPMG/QA Tax Strategy (["]Representation Letter"). . . .  Only after an interstate telephone call from Ms. Branan and Mr. Richie of KPMG to Mr. Jacoboni on June 16, 1998, during which they pressured Mr. Jacoboni and his lawyer, Tom Dixon, did Mr. Jacoboni sign and return via U. S. mail the May 15, 1998 letter. . . .
>
> 3)   Mail Fraud - Mr. Jacoboni received a copy of an August 31, 1998 "concurring opinion" from the law firm Brown & Wood LP, which was requested by Mr. Dale Baumann of KPMG.  The Brown & Wood concurring tax opinion was mailed from New York to Mr. Jacoboni in Florida.
>
> 4)   Mail Fraud - KPMG and QA Investments participated in the preparation of a misleading tax

return on behalf of Jacoboni. The Defendants knew that the plan was being investigated and had been challenged by the IRS[.] Nevertheless KPMG sent the return to Jacoboni using the U.S. Mail in October of 1998 knowing that Jacoboni would rely on KPMG's expertise and then mail the tax return to the IRS. . . .

5)    Mail Fraud - In late 2001, Mr. Jacoboni terminated the services of KPMG and retained a new accountant, Mr. Dean Orr . . . Mr. Jacoboni wrote several interstate letters to KPMG requesting transfer of his records to Mr. Orr. KPMG unreasonably delayed and stonewalled Mr. Jacoboni's requests. "Finally, Mr. James M. McMahon of KPMG wrote a January 29, 2002 letter to Mr. Orr attempting to impose unreasonable conditions on Mr. Orr's access to Mr. Jacoboni's records and KPMG's related work papers." . . .

6)    Wire Fraud - In September 1997, Ms. Carolyn Branan, a partner at KPMG, contacted Jacoboni over the phone to propose the KPMG/QA Tax Strategy. Throughout their conversations, she misrepresented the strategy by claiming it was a "no lose" proposition, was a "clean deal, never audited,"and strictly complied with IRS rules and regulations". At all times, KPMG knew that the strategy was risky and failed to disclose that knowledge to Jacoboni. . . .

7)    Wire Fraud - Carolyn Branan and Craig Richie of KPMG in Charlotte, North Carolina called Mr. Jacoboni in Florida on June 16, 1998. Mr. Jacoboni added his lawyer, Tom Dixon, in Detroit, Michigan, in a conference call. Ms. Branan and Mr. Richie pressured Mr. Jacoboni to sign and return the May 1998 "Representation Letter." In particular, Mr. Richie "assured Messrs. Jacoboni and Dixon that the KPMG Representations [sic] Letter was <u>not</u> prepared to

insulate KPMG from liability and that KPMG is 'still on the hook' if there was a problem down the road. Mr. Richie state[d] that KPMG would still be responsible if there was a problem or penalty as a result of a future IRS audit. . . .

8)    Wire Fraud - The complex series of transactions to implement the KPMG/QA Tax Strategy set forth in Paragraph 9 of the Complaint were carried out through interstate phone calls and wire transfers. ..." For example, Mr. Jacoboni received from KPMG via facsimile transmission a recap of his investment in UBS prepared by QA on October 7, 1997. There were also numerous interstate facsimile transmissions and wire transfers among Mr. Jacoboni and KPMG and QA and their agents to effectuate the 1997 investments." . . .

R&R at 9-10.

The Magistrate Judge then reasoned:

Applying the law to the facts alleged, it is clear that certain of the predicate acts allege breaches of fiduciary duty that coincide directly with the securities transactions that were part of the tax strategy. Specifically, the predicate acts set forth above as wire fraud "8" are intimately connected with the purchase and sale of the securities. Moreover, predicate acts identified above as mail fraud "2" and wire fraud "6" set forth breaches of fiduciary duty that can fairly be said to be "in connection with" the sale of securities.[7]

The remaining predicate acts, however, have no readily apparent connection to securities transactions, and can not be said to have "coincided" with the transactions. Indeed, the harm alleged to have occurred due to KPMG's conduct was not caused by the "basis shift" purchases of stock allegedly directed by KPMG, but

---

[7]In a footnote appended to this paragraph, the Magistrate Judge correctly noted: "Securities fraud encompasses more than the value or manipulation of a particular security." R&R at 11 n.4.

by the inclusion of the artificial loss in the preparation and filing of Plaintiff's tax return. *See, generally, Bacon v. Smith Barney Shearson, Inc.,* 938 F. Supp. 98 (D. N.H. 1996) (claim that firm had fraudulently represented that transfer of account in order to sell certain stocks would not result in adverse tax consequences was not a fraud in connection with the purchase or sale of a security.) As such, the PSLRA bar does not serve to insulate KPMG from Plaintiff's entire RICO claim, but only applies to prohibit Plaintiff from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" – that is, that conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8.

The Court recognizes that other courts appear to take an all or nothing approach to the bar. *See Burton v. Ken-Crest Services, Inc.,* 127 F. Supp. 2d 673, 676 (E.D. Pa. 2001) (rejecting argument that some predicate acts are not actionable as securities fraud and are thus separate and independent predicate acts for RICO purposes); *Bald Eagle, supra,* 189 F.3d at 330 (rejecting a "surgical presentation" of the claim); and *Stephenson v. Deutsche Bank AG,* 282 F. Supp. 2d 1032, 1072 at fn. 27 (D. Minn. 2003) (same). In each of these cases, however, there was a determination that the other predicate acts were so "closely connected to and dependent upon" the securities fraud as to "amount to" securities fraud. *See Burton, supra,* at 677 (noting "there is no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities" and stating "it is obvious that the entire cause of action surrounding the pension fund scheme involves some type of securities fraud and that the alleged acts are actionable under securities fraud statutes"); *Bald Eagle, supra* at 330 (finding that conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities since the conduct induces new investments); and *Stephenson, supra* at 1072, fn. 27 (finding that the challenged activity was "not distinct from the larger scheme, which the Court has already ruled is actionable as securities fraud.")

No such connection is present here with respect to the surviving predicate acts. Preparation and filing of tax returns (and the collection of fees for tax planning services and opinions) are acts

distinct from any securities transaction and are not actionable as securities fraud, and there is no allegation that KPMG used Jacoboni's participation in the strategy to induce others to purchase securities.

The Court also recognizes that this conclusion is substantially at odds with the analysis in *Loftin, supra,* which is presently on appeal. *Loftin* is not controlling, however, and is not persuasive on this issue.[8] Specifically, the Court notes that the *Loftin* court did not address the precise issue presented here with respect to the application of the PSLRA bar when non-related predicate acts are also alleged. In addition, the allegations in *Loftin* that the purpose of the alleged fraud was to induce the plaintiff "to invest in the transactions" runs contrary to the overall thrust of Plaintiff's allegations in this case to the effect that the purpose of the fraudulent scheme was simply to collect fees and expenses and to promote an improper tax avoidance strategy.

For the foregoing reasons, it is **respectfully recommended** that the motion be **granted, in part and denied, in part** as follows: The motion should be **denied** to the extent it seeks judgment on the pleadings, but **granted** to the extent it seeks to prohibit Plaintiff from relying upon any conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8 to establish a violation of section 1962. The practical effect of the Court's recommendation is to limit Plaintiff's RICO case to the remaining predicate acts. Because the Court does not recommend judgment on the pleadings with respect to the RICO claim, dismissal of the pendent state law counts is also inappropriate and the motion should be **denied** with respect to those counts.

R&R at 11-14 (footnote omitted from second quoted paragraph; emphasis in original).

As the Magistrate Judge aptly noted, "defining and categorizing conduct as securities or non-securities fraud is not easy, especially with respect to a complex and multifaceted

---

[8]In a footnote following this sentence, the Magistrate Judge observed that *Loftin* "reli[ed] on cases that are distinguishable from the factual scenario presented here." R&R at 13 n.6.

transaction." R&R at 7.  Truer words have never been spoken.  However, with all due respect to the Magistrate Judge's in-depth analysis of this admittedly difficult issue, the Court believes the R&R interprets the PSLRA too narrowly in the context of this case.

*S.E.C. v. Zandford*, 535 U.S. 813 (2002), teaches that while the "in connection with" requirement for securities fraud is not unlimited in scope, it is extremely broad.  All that is necessary to satisfy that requirement is proof of "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide."  535 U.S. at 825.  The breadth of this standard is illustrated by footnote 4 to the *Zandford* opinion.  There, the Supreme Court provided two examples of conduct that "would not include the requisite connection to a purchase or sale of securities":  where "a broker embezzles cash from client's account" or where a broker "takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction."  *Id.* at 825 n.4.  Since these examples involve conduct that is only tangentially connected to the sale of securities, the obvious implication is that conduct less tangentially related satisfies the "in connection with" test.

The Court fully agrees with the Magistrate Judge that RICO predicate acts 2, 6 and 8 are actionable as securities fraud.  However, the Court also views the other predicate acts as sufficiently connected to the sale of securities to support a claim of securities fraud.  In other words, the remaining predicate acts allege breaches of duty coincident with the securities transactions that were part of the tax strategy offered by KPMG.  Because Jacoboni contends the wrongful acts were committed as part of a single fraudulent scheme, all of the acts must be considered together for securities fraud purposes.  In that regard, the Court agrees with KPMG's

-12-

characterization of Jacoboni's RICO claim: "There are no 'non-securities components' to the alleged scheme to defraud asserted in Jacoboni's RICO claim.  Jacoboni asserts that he was the victim of a single scheme designed to fraudulently induce him to invest in UBS stock and other securities."  Doc. 184 at 16.  In other words, "without the purchase and sale of UBS stock and options and the Jacaranda warrant, there would have been no capital loss to offset Jacoboni's capital gain on his SSI stock."  *Id.* at 18.

This Court finds instructive Judge Ryskamp's analysis in *Loftin v. KPMG LLP*, 2003 WL 22225621 (S. D. Fla. 2003).  *Loftin,* like the present case, involved the FLIP tax strategy.[9] Loftin argued that the PSLRA did not bar his RICO claim against the law firm of Brown & Wood, which had issued favorable opinion letters concerning the strategy, "because the sale of securities was incidental to Brown & Wood's alleged fraud."  2003 WL 22225621 *6.  More specifically, Loftin claimed "that Brown & Wood's primary objective was not the sale of securities, but the sale of 'phony tax advice,'" with the result that the firm's alleged misconduct was not "in connection with" the sale of securities. *Id.*  Judge Ryskamp rejected that argument, stating:

> Loftin's Complaint alleges that the Defendants' "pattern of racketeering activity, including the mail and wire fraud, were all committed in an effort to induce [him] to invest in the transactions and, in turn, pay millions of dollars in fees and related expenses to the Enterprise."  (ACC ¶ 69.)  The transactions consisted of the purchase and sale of securities. (ACC ¶¶ 38, 49.)  Thus, Brown & Wood's alleged actions were "in connection with" the purchase and transfer of securities, thereby implicating the PSLRA bar.  *See Zandford,* 535 U.S. at

---

[9] *Loftin* also involved a strategy known as "BLIP."

> 819, 122 S.Ct. at 1903 (explaining that the Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" and holding that a broker's alleged selling of securities with intent to misappropriate the proceeds was "in connection with" the sale of the securities) (internal quotation omitted).

*Id.* at *6.

In this Court's view, this reasoning applies equally to the instant case. Similar to the allegation in *Loftin*, Jacoboni's RICO Case Statement asserts that "KPMG and QA Investments committed all of the predicate acts as part of one common plan to induce potential clients into investing with them." Doc. 29 at 10. Moreover, Jacoboni's "tax advice fraud" characterization urged here, Doc. 233 at 4, is akin to "phony tax advice" argument rejected in *Loftin*. Based on *Loftin*'s reasoning, the PSLRA precludes Jacoboni's entire RICO claim.

## B. Supplemental Jurisdiction

The Court next examines whether it should continue to exercise supplemental jurisdiction over Jacoboni's state law claims. To reiterate, those claims are breach of contract, accountant malpractice, fraud, negligent misrepresentation, promissory estoppel, and violation of Florida's Deceptive and Unfair Trade Practices Act (DUTPA).

Title 28, United States Code, Section 1367 codifies the doctrines formerly known as pendent and ancillary jurisdiction. *See Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1562 n.3 (11th Cir. 1994). "[W]henever a federal court has supplemental jurisdiction under section 1367(a), that jurisdiction should be exercised unless section 1367(b) or (c) applies." *Palmer,* 22 F.3d at 1569. Under § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state claim where, as here, it "has dismissed all claims over

which it has original jurisdiction[.]"  If, after examining the provisions of § 1367(c), the district court determines that it has the discretion to decline jurisdiction, it should consider traditional factors bearing on the exercise of pendent jurisdiction.  *Palmer*, 22 F.3d at 1569.  Those factors include "judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together."  *Id.*

Obviously, the Court has the discretion to decline to exercise supplemental jurisdiction over Jacoboni's state claims, inasmuch as it has "dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  Accordingly, the Court will examine the factors listed in *Palmer* to determine the proper exercise of that discretion.

In the Court's view, considerations of judicial economy, convenience and fairness are intertwined in this case.  It is true that this matter has been pending in this court for nearly two years and the undersigned judge is already familiar with the case.  However, only state claims remain, and considerations of practicality and comity counsel that a state judge is best equipped to adjudicate those claims.   "Resolution of [Jacoboni's] state law claims depends on determinations of state law," and "[s]tate courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1353 (11ᵗʰ Cir. 1997).[10]  This is particularly true here, given the fact that this is a complex case and involves, *inter alia,*

---

[10]The quoted statement appears in the district court's opinion attached as Exhibit "A" to the Eleventh Circuit's *Baggett* decision.  The appellate court expressly adopted the lower court's opinion. *See* 117 F.3d at 1344.

a claim brought under Florida's DUTPA.[11]  Moreover, the fact that this case was scheduled to be tried soon does not preclude this Court from electing not to proceed on the state claims. Although this case has proceeded through the completion of discovery, Jacoboni (and KPMG) can use the evidence gleaned through that process to litigate their dispute in state court.  *See Annulli v. Panikkar*, 200 F.3d 189, 202-03 (3d Cir. 1999) (rejecting plaintiff's argument that "two years of litigation, fifteen pages of court docket, 1,800 pages of deposition testimony, and 2,800 pages of discovery documents militate in favor of retaining jurisdiction over his case, especially as he was on the eve of trial when the Defendants filed their motion for summary judgment"), *abrogated on other grounds by Rotella v. Wood,* 528 U.S. 549 (2000).  Moreover, "little additional pretrial preparation will be required in state court." *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994) (holding that the "district court did not abuse its discretion in declining to exercise jurisdiction over the state-law claims shortly before trial").  In this Court's view, this case is in sufficient shape that it could be set for trial in state court immediately after the pleadings close; this would not present a lengthy delay.  Additionally, Jacoboni faces no time-bar threat resulting from dismissal of his state claims; by virtue of the "savings" provision embodied in § 1367(d), he is free to refile those claims in state court within 30 days (unless Florida law provides for a longer period).

---

[11]The Court is unpersuaded that it should allow the state claims to remain here on the asserted basis that they involve some issues of federal tax law.  This Court is no tax court.  Any such issues can be handled equally well by a judge of the state court bench.  In any event, any marginally greater familiarity this Court might have with tax issues is overbalanced by a state judge's familiarity with predominant issues of state law.

The remaining factor - whether all the claims would be expected to be tried together - appears more pertinent to the situation where original jurisdiction continues to exist and a court is attempting to determine whether it should nevertheless decline jurisdiction over supplemental state claims, i.e., the scenarios envisioned by § 1367(c)(1), (2) and (4). Clearly, that is not the situation here. However, to the extent this factor applies to the present case, the Court determines that all of the state claims should be tried together - in state court.

Further, where, as here, the federal claims are dismissed prior to trial, dismissal of supplemental state claims is "strongly encourage[d] or even require[d]." *Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir.) (holding that since all federal claims were dismissed before trial, district court appropriately declined to exercise supplemental jurisdiction over remaining state claim), *cert. denied,* 528 U.S. 820 (1999); *see also, Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1353 (11th Cir. 1997) (stating that it was "especially true" that Georgia court should resolve remaining state claims "where the Court is dismissing Plaintiffs' federal law claim prior to trial");[12] *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (articulating as a "rule of thumb" that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed"), *amended on denial of reh'g*, 1998 WL 117980 (6th Cir. 1998); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.) (noting "general rule" that district court should relinquish jurisdiction over state

---

[12]Again, this quoted statement appears in the district court's opinion attached as Exhibit "A" to the Eleventh Circuit's *Baggett* decision.

law claims when all federal claims are dismissed before trial), *cert. denied*, 525 U.S. 870 (1998).

As previously discussed, given the PSLRA's prohibition against founding RICO claims on securities violations, Jacoboni should never have advanced such a claim under the facts of this case. He took a calculated risk by combining his state claims with a RICO claim. His counsel "must have realized that the jurisdiction he invoked was pendent and possibly tentative." *Pitchell*, 13 F.3d at 549. In other words, Jacoboni and his attorneys "knowingly risked dismissal of his pendent claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power." *Annulli*, 200 F.3d at 203 (citing *Pitchell*).

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The Magistrate Judge's February 5, 2004 Report and Recommendation (Doc. 181) is APPROVED AND ADOPTED insofar as it determines that RICO predicate acts 2, 6 and 8 are barred by the PSLRA. The Court declines to adopt the R&R insofar as it recommends denial of KPMG's Motion for Judgment on the Pleadings (Doc. 143). The R&R is moot with respect to the Magistrate Judge's recommendations concerning KPMG's Motion for Summary Judgment (Doc. 155) and KPMG's Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159).

2. KPMG's Objections (Doc. 184) to the R&R, filed February 23, 2004, are sustained insofar as KMPG objects to the Magistrate Judge's recommendation that KPMG's Motion for Judgment on the Pleadings be denied. In all other respects, KMPG's objections are moot.

-18-

3.  KPMG's Motion for Judgment on the Pleadings (Doc. 143), filed November 5, 2003, is GRANTED.

4.  The Clerk shall enter a final judgment providing that the Plaintiff, Joseph J. Jacoboni, shall take nothing on his federal civil racketeering claims against the Defendant, KPMG LLP, and further providing that the Defendant shall recover its costs of action.

5.  KPMG's Motion for Summary Judgment (Doc. 155) and Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159), both filed November 24, 2003, are moot.

6.  Any other pending motions not addressed in this Order are likewise moot.

7.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Accordingly, those claims are DISMISSED, WITHOUT PREJUDICE.  Plaintiff is free to refile those claims in state court within the time constraints set forth in 28 U.S.C. § 1367(d).

8.  The Clerk shall close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida this ___11th___ day of March, 2004.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Assigned Magistrate Judge
Administrative Law Clerk
Courtroom Deputy

-19-

F I L E   C O P Y

Date Printed: 03/11/2004


Notice sent to:

        ___     Frank A. Hamner, Esq.
                GrayRobinson, P.A.
                301 E. Pine St., Suite 1400
                P.O. Box 3068
                Orlando, FL  32802-3068

                6:02-cv-00510    cbh


        ___     W. L. Kirk Jr., Esq.
                Rumberger, Kirk & Caldwell, P.A.
                300 S. Orange Ave., Suite 1400
                P.O. Box 1873
                Orlando, FL  32802-1873

                6:02-cv-00510    cbh


        ___     Joseph Bernard Haynes, Esq.
                King & Spalding
                191 Peachtree St., N.E.
                Atlanta, GA  30345-1763

                6:02-cv-00510    cbh